■ FERTICO BELGIUM S. A., Respondent, v PHOSPHATE CHEMICALS EXPORT ASSOCIATION, INC., Appellant.—Judgment, Supreme Court, New York County (A. Klein, J.), entered January 7, 1985, upon a jury verdict, which awarded plaintiff $1,070,000 damages, plus interest, costs, and disbursements on

plaintiff's second cause of action, and dismissed the first cause of action, unanimously modified, on the law, the award of damages vacated, the matter remanded for a new trial on the limited issue of damages on the second cause of action to be determined on the basis of $352,500 less plaintiff's net profit on the resale of defendant's goods accepted by plaintiff, and, as modified, affirmed, without costs.

The limited issue presented on this appeal is whether a buyer's measure of damages for cover under Uniform Commercial Code § 2-712 permits recovery of cover damages in addition to profits realized on a renegotiated sale of the accepted goods in a rising market. We hold that the remedy of cover does not include such profits. Accordingly, we modify the judgment to vacate the award and to remand the matter for a new trial on the limited issue of damages.

Plaintiff Fertico Belgium S. A. (Fertico) was a Belgian corporation, headquartered in Brussels and engaged in international trade of fertilizer. Defendant Phosphate Chemicals Export Association, Inc. (Phoschem) is a nonprofit Delaware corporation engaged in the export sale of phosphate fertilizer. Its nine members are domestic producers of such fertilizer.

In October 1978, Phoschem entered into a contract with Fertico to deliver to Antwerp, Belgium, 15,000 tons of fertilizer between November 1 and 15, 1978, but no later than November 20, 1978, and to deliver an additional 20,000 tons between November 15 and November 30, 1978. Shipment was to be made on each installment 15 days after receipt of plaintiff's letter of credit. Plaintiff purchased the fertilizer to fulfill its agreement with Altawreed, Iraq's agricultural ministry. Although plaintiff timely opened the requisite letter of credit for the first shipment on October 26, 1978, the shipment was delayed, at least in part due to the chosen shipping route via Hamburg, West Germany, initially, and only then to Antwerp. The goods did not arrive until December 17 and were not unloaded until December 21, 1978. Fertico canceled the second shipment.

Having advance notice that the delivery would not arrive in time for Fertico to meet its commitment to Altawreed, Elias F. El-Alam, Fertico's founder, president, chairman, and majority shareholder, took steps to cover for the goods. He purchased substitute fertilizer in Lebanon costing $700,000 more than he had agreed to pay Phoschem. He then renegotiated his sales agreement with Altawreed, which held plaintiff's performance bond for approximately $1,000,000. In exchange

for an extension of time and a higher purchase price discussed *infra,* plaintiff agreed to deliver the goods directly to inland sites, rather than to the seaport of Basrah.

Fertico accepted the contract goods upon their belated arrival in late December 1978, since Phoschem had drawn down its letter of credit for an amount in excess of $1.7 million. Several months later, El-Alam sold the fertilizer to a third party for a profit of approximately $450,000 over what it paid to Phoschem.

In 1981 Fertico, having entered the Belgian equivalent of bankruptcy, commenced this action, seeking, *inter alia,* $1.25 million in damages in conjunction with its second cause of action for breach of the October 1978 contract. The increased costs Fertico purportedly incurred under its new inland obligation with Altawreed were claimed as consequential damages.

Between October 22 and 29, 1984, the case was tried on the first cause of action (involving breach of an alleged requirement contract*) and the second cause of action before the Supreme Court and a jury. The jury apparently dismissed the first cause of action in short order, and rendered a verdict for plaintiff on the second cause of action. It found that damages were "$1,070,000—The total loss, whatever it is". As one juror stated to the court, "We weren't sure whether that figure was the exact number. Some of us weren't sure, so that's why we put the explanation in."

Defendant assigns as error the trial court's failure to charge the jury that (1) any damages awarded could not include the $20.50 per ton extra transportation costs which were reimbursed by a higher purchase price from Altawreed, and (2) the damages had to be reduced still further by the amount of any profit realized on resale of the accepted goods, leaving plaintiff without any damages at all. We agree.

Under Uniform Commercial Code § 2-711 (1) (a); § 2-712 (2), a covering buyer "may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages * * * but less expenses saved in consequence of the seller's breach." El-Alam's testimony at trial, as corroborated by the written contract between Altawreed and plaintiff, revealed that Altawreed had reimbursed plaintiff for inland freight transportation costs by paying an extra $717,500 ($20.50 per metric ton of fertilizer) as part of their renegotiated agreement. Fertico

---

* A contract whereby one agrees to buy all the merchandise of a designated type which the buyer may require for use in its business.

omitted these extra profits in computing its damages. Phoschem was entitled, as a matter of law, to have the $717,500 in purported transportation costs deducted from the damage claim. Plaintiff cannot both reap the profits of the renegotiated agreement with Altawreed and, at the same time, force Phoschem to provide reimbursement for the inland freight costs. Such a windfall is not consonant with the overriding goal of the remedies available under the Uniform Commercial Code: to put the wronged party in as good a position as he would have been if the other party had fully performed. Fertico could not have performed under both the contract to deliver to Basrah and the renegotiated contract to deliver inland. It is not entitled to retain the profits realized in a transaction wholly dependent upon Phoschem's breach. Such profits are in fact "expenses saved in consequence of the seller's breach" within the meaning of UCC 2-712 (2). *(See, Banner Iron Works v Amax Zinc Co.,* 621 F2d 883, 888 [8th Cir 1980]; *Thompson & Co. v Miller Mtge. Co.,* 457 F Supp 996, 999 [SDNY 1978].)* Fertico's characterization of these profits as costs is misleading. It did not incur any such costs. Phoschem should not be required to reimburse these costs since the obligation to which they relate was nonexistent at the time of defendant's breach. Phoschem was not obligated under its C & F Antwerp contract to arrange inland freighting to Iraq.

We conclude further that a buyer may not collect cover damages and retain the profit realized in a rising market upon resale of the accepted goods. Plaintiff's sale of the goods accepted in Antwerp, like the renegotiated Altawreed contract, stemmed from and was dependent upon, Phoschem's breach. Profits reaped on the sale represent a windfall which must be deducted from cover damages plus storage and handling expenses. Since the record is devoid of evidence as to storage and handling expenses, a new trial is necessary to determine plaintiff's net profit.

Contrary to plaintiff's assertions, rejection of goods is not a precondition to a buyer's election to cover. Such a precondition is not set forth in the pertinent UCC provisions, sections 2-711 and 2-712. Section 2-708 lends no support to Fertico's position. It concerns the remedies of an aggrieved seller who has an inexhaustible supply of goods and may recover lost profits despite resale of the particular goods to a third party on the theory that he would have made both sales. *(Neri v Retail Mar. Corp.,* 30 NY2d 393 [1972].)* Here, by contrast,

Fertico, as an aggrieved buyer, had a single contract with Phoschem to purchase a fixed quantity of goods.

We have examined the parties' remaining contentions, and find that the other errors were harmless. Justice would not be served by retrial of this entire matter. The trial was lengthy, the issues were complex, and the plaintiff's sole witness to the underlying events, El-Alam, has died. Concur—Kupferman, J. P., Sullivan, Ross, Kassal and Rosenberger, JJ.