OPINION OF THE COURT
Edward H. Lehner, J.
The sole issue presented on the motion and cross motion for *716 partial summary judgment is whether, in the event plaintiff establishes a contract between the parties and a breach thereof, the measure of damages should be governed by UCC 2-706 (difference between contract price and resale price) or UCC 2-708 (difference between contract price and market price at time of tender).
FACTS
Plaintiff asserts that it contracted to sell approximately 10 million gallons of gasoline to defendant at a price of $1.30 per gallon, having purchased it a few days earlier at $1.26 per gallon. After plaintiff sent notice of the name of the vessel to deliver the product, it was informed by defendant that the gasoline would not be accepted in view of the absence of a binding agreement resulting from the untimely acceptance of its offer. While the loaded vessel was proceeding to New York, plaintiff negotiated the sale of the cargo on board to Esso Sapa in Argentina for $1.10 per gallon.
CONTENTIONS OF THE PARTIES
Plaintiff claims that because of a sudden sharp drop in price, the value of the gasoline at the time of defendant’s breach was between 75 cents to 80 cents per gallon and that, although it resold the product for $1.10 per gallon, its recovery should not be limited to its actual loss resulting from the breach (20 cents per gallon plus incidentals), but rather it is entitled to recover the difference between market price and contract price. If plaintiff were to prevail on this claim, it could recover at least $3,000,000 in excess of its actual contractual loss (10,000,000 gallons times difference of 30 cents per gallon between the resale price of $1.10 and highest market price discussed of approximately 80 cents per gallon).
Plaintiff justifies this recovery by asserting that it, rather than the defaulting buyer, is entitled to the benefit of its ability to resell the gasoline at above market price. Although the price for which one actually sells merchandise is evidence as to its market value, and there is no explanation as to why Esso Sapa was willing to pay a premium of about 40% above market to obtain this cargo, the question as to the actual market value is not raised for determination on this motion.
Plaintiff maintains that since gasoline is fungible, it, as a dealer in that commodity, could have made a profit not only on the sale to defendant, but also could have purchased *717 gasoline on the open market and made a second profit on the resale to Esso Sapa. Hence it asserts (putting aside incidental damages) that by recovering damages of 50 cents per gallon (assuming a market price of 80 cents per gallon at the time) from defendant, it will be in the same position as if defendant had complied with its alleged contract and accepted the gasoline and paid $1.30 per gallon. This is calculated by deducting from such 50 cents per gallon damages, the loss of 16 cents per gallon (difference between purchase price of $1.26 and sales price to Esso Sapa of $1.10) with a resulting 34 cents per gallon net profit. This equals the total of the 4 cents per gallon profit it would earn on the alleged contract if performed (difference between purchase price of $1.26 and contract price of $1.30) and the 30 cents profit that allegedly could be earned if it purchased gasoline on the open market at 80 cents per gallon and resold it to Esso Sapa at $1.10. To support its position, plaintiff relies on UCC 2-703 as giving it the option to proceed against a defaulting buyer under either UCC 2-706 or 2-708.
Defendant, on the other hand, asserts that if plaintiff establishes a breach, its damages should be limited to its actual loss resulting therefrom, which would be 20 cents per gallon plus incidental damages. In this regard defendant points to UCC I-106, which it asserts sets forth the policy of the Code to place an aggrieved party in as good a position as if the other party had fully performed, and contends that granting plaintiff the profit it seeks would result in a windfall which would be inconsistent with such policy. Further, defendant maintains that permitting plaintiff to choose its remedy to maximize its damages would be inconsistent with the requirement that a party mitigate damages.
STATUTES INVOLVED
Subdivision (1) of UCC 2-706 and subdivision (1) of UCC 2-708 provide as follows: section 2-706 (1): "Under the conditions stated in Section 2-703 on seller’s remedies, the seller may resell the goods concerned or the undelivered balance thereof. Where the resale is made in good faith and in a commercially reasonable manner the seller may recover the difference between the resale price and contract price together with any incidental damages allowed under the provisions of this Article (Section 2-710), but less expenses saved in consequence of the buyer’s breach.” Section 2-708 (1): "Subject to subsection *718 (2) and to the provisions of this Article with respect to proof of market price (Section 2-723), the measure of damages for nonacceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in this Article (Section 2-710), but less expenses saved in consequence of the buyer’s breach.”
Section 2-703 provides that if a
"buyer wrongfully rejects or revokes acceptance of goods * * * then with respect to any goods directly affected * * * the aggrieved seller may * * *
"(d) resell and recover damages as hereafter provided (Section 2-706); [or]
"(e) recover damages for non-acceptance (Section 2-708)”.
DISCUSSION
Although the Official Comment to section 2-703 states that the "Article rejects any doctrine of election of remedy as a fundamental policy and thus the remedies are essentially cumulative in nature”, it concludes that "[w]hether the pursuit of one remedy bars another depends entirely on the facts of the individual case.”
In 1 White and Summers, Uniform Commercial Code (at 354 [Practitioner’s 3d ed 1988]), the distinguished authors indicate that the Code and Comments in this area are "equivocal”, and that "[w]hether the drafters intended a seller who has resold to recover more in damages under 2-708 * * * is not clear.” (Op. cit., at 352.)
On this question, White and Summers conclude that: "a seller who resells goods reasonably identified to the broken contract for a price above the 2-708 (1) market price should be limited to the difference between the contract price and his actual resale price. We believe that this is an exact measure of his expectation and that he should not recover more than that. As indicated above, the buyer bears the burden of showing that the seller was not a lost volume seller, and that the goods which in fact were resold were those that would have been delivered to him, the breaching buyer.” (Op. cit., at 356.) In so concluding the authors expressed the following caveat: "All of the foregoing discussion assumes that the buyer who wishes to limit the seller to the difference between the contract and the resale price can show that the goods resold were in fact the goods contracted for. If the seller could *719 have fulfilled the buyer’s contract by buying on the market or by a choice among a variety of fungible goods, the buyer will be unable to limit the seller to 2-706 damages. The buyer will not be able to prove that the resale is 'reasonably identified as referring to the broken contract.’ Put another way, the difference between the contract and a specific resale price is not the proper measure of the seller’s expectation damages unless that resale is a substitute for the one actually conducted.” (Op. cit., at 355.)
The foregoing position has generally been that enunciated by the courts that have considered the issue. In Nobs Chem. v Koppers Co. (616 F2d 212, 215 [5th Cir 1980]), the court (after observing the lack of "any law directly on point”) limited damages on a breach of contract for the sale of chemicals to that provided in UCC 2-706. It heavily relied on the policy provision set forth in UCC 1-106 (1) that "[t]he remedies provided by this Act shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed”, concluding that: "No one insists, and we do not think they could, that the difference between the fallen market price and the contract price is necessary to compensate the plaintiffs for the breach. Had the transaction been completed, their 'benefit of the bargain’ would not have been affected by the fall in market price, and they would not have experienced the windfall they otherwise would receive if the market price-contract price rule contained in § 2.708 (a) is followed.” (Supra, at 215; accord, H-W-H Cattle Co. v Schroeder, 767 F2d 437, 440 [8th Cir 1985] [where the admonition of UCC 1-106 carried the day, the court finding that the section suggested that it "should look through the form of a transaction to its substance when necessary to fulfill the parties’ expectations expressed in the contract”]; Coast Trading Co. v Cudahy Co., 592 F2d 1074 [9th Cir 1979]; Union Carbide Corp. v Consumers Power Co., 636 F Supp 1498, 1501 [ED Mich 1986] [where it was stated that UCC 2-708 did "not authorize awards of damages which put the seller in a better position than performance would have put them”].)
The Union Carbide case (supra, at 1503) properly distinguished Trans World Metals v Southwire Co. (769 F2d 902 [2d Cir 1985]), relied upon by plaintiff, as there it was found that the parties to the contract assumed the risks of price variations, and to deny plaintiff a gain from a drop in prices would unjustly deny it the benefit of its bargain.
Here the alleged contract would not in any way be affected *720 by the sharp drop in prices that occurred, as the contract was for a fixed price of goods already purchased. Hence, the result reached by the Second Circuit in Trans World (supra) is not pertinent to the case at bar.
Plaintiff asserts that the foregoing cases are inapposite because New York legislative history calls for a different result. This argument is based on the 1956 New York Law Revision Commission (Appendix IV, at 396) recommendation to delete language in the draft of UCC 2-703 (e) that would have limited UCC 2-708 to situations where the " 'goods have not been resold’ ”. This recommendation was apparently accepted by the Commissioners on Uniform State Laws, and hence the Code in New York, and elsewhere does not contain such language. This is hardly reason to call for an interpretation of the Code in New York different from that in other States.
In explaining this deletion, White and Summers state: "It is possible that the New York Law Revision Commission had in mind the seller who would not receive a windfall by suing under 2-708 (1) and simply wanted to make it clear that a seller who makes a good faith attempt to comply with 2-706 but fails may then resort to 2-708 (1). Nothing in their report suggests that they considered the case in which 2-706 recovery would be small because the seller sold at a price very near to the contract price yet the contract-market differential under 2-708 would be large.” (Op. cit., at 354.) In B & R Textile Corp. v Rothman Indus. (101 Misc 2d 98 [Civ Ct, NY County 1979]), UCC 2-708 was used in the type of situation contemplated by the authors. There damages were measured by that section because a UCC 2-706 recovery was not permissible due to the seller’s failure to give the required notice of intention to resell. In that case, however, damages were the same under either measure as the market price was found to be the same as the resale price.
Further, Official Comment 2 under UCC 2-706 states that "[failure to act properly under this section deprives the seller of the measure of damages here provided and relegates him to that provided in Section 2-708” (emphasis supplied), thus implying that it was contemplated that UCC 2-708 recoveries would be less than the contract-resale price differential authorized in UCC 2-706.
Moreover, if UCC 2-708 could not be employed if the goods had been sold, a merchant who sells from inventory would *721 lose his profit if required to reduce damages recoverable from a defaulting buyer by the amount of the sale price of the item when sold to another customer. Thus, in Neri v Retail Mar. Corp. (30 NY2d 393, 400 [1972]), the Court of Appeals, in allowing a UCC 2-708 (2) recovery of lost profits by a retailer of boats, quoted the following from an illustration contained in Hawkland, Sales and Bulk Sales (1958 ed): " 'Thus, if an automobile dealer agrees to sell a car to a buyer at the standard price of $2000, a breach by the buyer injures the dealer, even though he is able to sell the automobile to another for $2000. If the dealer has an inexhaustable supply of cars, the resale to replace the breaching buyer costs the dealer a sale, because, had the breaching buyer performed, the dealer would have made two sales instead of one. The buyer’s breach, in such a case, depletes the dealer’s sales to the extent of one, and the measure of damages should be the dealer’s profit on one sale.’ ”
Thus, it is clear that the deletion of the proposed condition for the use of UCC 2-708 does not mean that the drafters of the Code contemplated the type of recovery sought by plaintiff herein.
Plaintiff, in essence, wishes to be accorded the same treatment as the car dealer in Professor Hawkland’s illustration. However, there are significant differences that warrant the court declining such application. Here plaintiff was selling to Esso Sapa a specific cargo aboard a specific vessel, and thus the gasoline aboard that ship may be considered as goods identified (see, UCC 2-501 [1] [a]) to a broken contract.
On page two of plaintiff’s initial memorandum of law it is stated: "After unsuccessfully attempting to convince [defendant] to honor its contract, [plaintiff] scrambled to find a new buyer and, on July 17, after feverish, lengthy and deliberate negotiations, concluded a sale to Esso Sapa.” On page 348 of the deposition of plaintiff’s witness he testified that, in seeking to sell the gasoline to a representative of Esso Sapa, "I asked him to buy the cargo.”
These statements are illustrative of the fact that although gasoline of the type involved in the action is fungible, and thus may be purchased in the marketplace by anyone (including traders such as plaintiff) in a position to finance the transaction, the sale here to Esso Sapa was clearly a substitute for the one plaintiff claims it actually contracted for with defendant.
*722 If plaintiffs damages are measured in accordance with UCC 2-706, it would be receiving the benefit reasonably to be expected when it entered into the alleged contract with defendant. Granting it the approximately $3,000,000 additional recovery that it seeks would result in a windfall which cannot be said to have been in the contemplation of the parties at the time of their negotiations, and would be inconsistent with the policy of the Code as expressed in UCC 1-106.
Accordingly, the court concludes that the proper interrelationship of sections 2-706 and 2-708 is that summarized by White and Summers above and followed in the cases cited. Thus, in the event plaintiff prevails and establishes a breach of contract at trial, its damages will be measured in accordance with section 2-706.
The situation would be different if plaintiffs sale were from its inventory (in which case it would be treated as the car dealer mentioned above), or if it had already contracted to sell the product to Esso Sapa, or perhaps even if it was then actually engaged in negotiations for trades in this type of gasoline. However, no such claim is made. The statement in plaintiff’s reply memorandum of law that "in all likelihood, [plaintiff] would have negotiated such a sale [to Esso Sapa] even in the absence of [defendant’s] breach” is not supported by any facts in the record, as there are no allegations that plaintiff had any negotiations then pending for the sale of this type of gasoline with Esso Sapa or any other party. This is simply a case where plaintiff, in an effort to mitigate its damages, went out and made a sale of a specific identified cargo of gasoline aboard a vessel then proceeding to New York.
The decision in Fertico Belgium v Phosphate Chems. Export Assn. (70 NY2d 76 [1987]) does not require a different result. There a "trader in fertilizer who both buys and sells”, whose purchase contract was breached by late delivery, was allowed to recover damages for the increased cost to acquire product from a third party, without any deduction for profit realized on its subsequent sale of the untimely delivered goods. (Supra, at 83.)
The court noted that "the facts here are exceptional” because the buyer who met its resale obligation by acquiring necessary fertilizer from a third party also had in its possession the late-delivered product which it had already paid for under a letter of credit, and "had no commercially reasonable *723 alternative but to retain and resell the fertilizer.” (Supra, at 79.) The dissent observed that under the majority view a seller who totally fails to deliver is in a better position than one who delivers late as in the former case the seller could make a profit from the goods in his possession, while the latter he gets no credit for the profit made by the buyer on the sale of the untimely delivered goods.
In any event, the "particular problem” faced under the "exceptional” circumstances (supra, at 83) of a buyer having possession of untimely delivered goods which had been paid for is not analogous to the situation at bar. Here we have one specific cargo of product with which the parties were dealing.
Lastly, although Comment 1 to UCC 2-703, indicating that the remedies pursuable depend "entirely on the facts of the individual case”, relates to seller’s remedies, the decision in Fertico (supra) demonstrates the flexibility of the Code in the application of its rules to particular fact patterns.
The motions for partial summary judgment are decided in accordance with the foregoing.