*554 OPINION OF THE COURT
William J. Davis, J.
The action arises out of a sale of 210,000 barrels of Algerian number two gasoil, sometimes referred to as home heating oil, in December 1989 for delivery in January 1990. The parties agreed to a fixed price of $.9770 per gallon during this period of severe cold temperature. Soon thereafter there was a precipitous change in the weather and the demand for heating oil dropped as did the price. The plaintiff claims that defendant breached the contract by failing to timely deliver. Defendant claims timely delivery.
The parties have stipulated to undisputed facts. In brief, the initial agreement of sale (Agreement) was entered on or about December 22, 1989 between Clark Oil Trading Company (Clark), the buyer, and J. Aron and Company (Aron), the seller. The terms of the Agreement were drafted and confirmed by Aron’s broker, Petroder (U.S.A.) Limited (Petroder). Pursuant to its terms, payment would be made either upon presentment of an invoice or under a letter of credit (LC), the latter was drafted by Clark and presented to its bank, Bank Paribas (BP). Both the Agreement and LC provided for the delivery date of the cargo to take place between January 10 to 15, 1990. Timely delivery would take place upon the tender of notice of readiness (NOR).
In the interim, Aron nominated the vessel, The Zina (The Zina), a Boston-size vessel carrying 210,000 barrels of gasoil. Clark accepted the nomination and designated Albany, New York, as the discharge port. Aron, however, informed Clark that The Zina could not go north of the George Washington Bridge because the owner would not permit it. Aron blamed Petroder for the error in not restricting the vessel north of the George Washington Bridge. In a separate action Aron settled with Petroder for the sum of $150,000. Ultimately, Clark accepted Aron’s offer, at its expense, to provide a larger vessel, The Maersk Mostoles (The Maersk), which was carrying over 400,000 barrels of gasoil. The Maersk was to lighter 150,000 barrels of gasoil on to a smaller vessel, The Patricia (The Patricia), a Boston-size vessel. The Patricia would then make its way to Albany. In addition, Clark agreed at its expense to lighter 60,000 barrels off The Maersk or The Zina, which ever came first. If Clark had no barge available, then Aron would discharge the 60,000 barrels at the IMTT oil-storage facility based in Bayonne, New Jersey (IMTT). In turn, Clark agreed to *555 amend the LC to include the price differential to Albany as opposed to Boston and to extend the delivery date to January 10 to 17. The amendment also allowed for partial delivery and partial draw on the LC. Clark drafted the LC and forwarded it to BP. BP followed by amending the LC to include the changes. The delivery date contained in the Agreement remained unchanged.
During the weekend of January 12 to 14, 1990, the Master of The Patricia and/or The Maersk attempted, but failed, to lighter. The operation was to take place in international waters off Delaware, but was discontinued due to weather conditions. Aron had to make another delivery with The Maersk on or before January 15, in Riverhead, Long Island. Aron directed that The Maersk leave for Riverhead to discharge that particular cargo. Aron contemplated that it would be able to perform its delivery with Clark on or before January 17.
On the morning of January 15, Aron’s oil scheduler informed his counterpart at Clark of the problems it had with regard to lightering the subject cargo. He informed Clark that Aron would complete the lightering of the 150,000 barrels by early January 16, with The Maersk arriving in New York harbor on January 17, to lighter or discharge the 60,000 barrels. Instead, on or about January 15, 1990, at the close of business day, Clark served Aron with a notice of breach of contract. But, Aron complained that there was no breach and that it had until January 17 to deliver the cargo. Aron also informed Clark that the LC had not yet expired and that it intended to perform and discharge the cargo at IMTT. Clark refused to perform any further. The Maersk tendered NOR in the late hours of January 16, and discharged approximately 197,000 barrels of gasoil to the order of Clark at IMTT before midnight January 17. Aron served an invoice upon Clark. Clark refused to pay. Aron served notice on Clark that it would draw on the LC. Clark objected to the draw on the LC, but Aron presented documents to BP on or about January 25, 1990, and received payment of approximately $8.09 million. On or about January 26, 1990, Clark demanded the issuance of tank warrants from IMTT. After they were received, Clark sold the gasoil to third parties. Between February 1 through March 20, 1990, Clark received a total of approximately $4.9 million.
Clark commenced the instant action to recover the difference between the amount it received in sales and the amount paid to Aron under the LC. It interposes two causes of action. First, that Aron breached the Agreement. Second, that Aron *556 wrongfully drew against the LC. Aron answers and counterclaims for breach of contract and incidental damages. Aron concedes that the $150,000 received from Petroder is a setoff against damages awarded herein.
The Uniform Commercial Code (UCC) and the principles of law and equity are applicable to the instant transaction because it involved the sale of goods between merchants (UCC 1- 103; T. W. Oil v Consolidated Edison Co., 57 NY2d 574). It is noted that the Agreement and the first LC contained mutual dates of delivery and the LC provided for the method of payment. Although the Agreement’s date of delivery was not revised, the amended LC modified and controlled the date of delivery because Clark’s obligation to pay Aron under the Agreement was suspended as long as there was a LC (UCC 2- 325). It is noted that the LC constituted a separate contract between BP and Aron (United Bank v Cambridge Sporting Goods Corp., 41 NY2d 254), but the LC was drafted by Clark and the method of payment was intertwined with the date of delivery. Aron could only be paid if it tendered NOR within the delivery date of the LC, which was at one time the exact date set out in the Agreement. Hence, delivery of the cargo and entitlement to payment were intended to be simultaneous events. Had the delivery date of the Agreement been amended to postdate the delivery date of the LC and Aron delivered timely under the Agreement, BP would not have been obligated to honor Aron’s presentment of documents. Aron had to obtain payment directly from Clark under the Agreement, but that would have been inconsistent with Clark’s initial intent of suspending its obligation to pay Aron as long as there was a LC.
 The amendment of the LC provided for partial shipment, but did not state that 150,000 barrels must be delivered on or before January 15, 1990. The Agreement did not provide that a partial delivery must be completed by January 15. Had Clark intended that there be a specific partial delivery on January 15, 1990, it would have sought to modify the Agreement and provided same in the amended LC, which it drafted. The fact that the amended LC allowed for partial delivery and partial withdrawal does not, without more, support the finding that failure to partially deliver on or before January 15, constituted a breach of the Agreement. The application of the parol evidence rule (W.W.W. Assocs. v Giancontieri, 77 NY2d 157) to explain what Clark intended when it agreed to amend the LC is of no benefit to Clark. Clark’s witness, Steven Wirkus, *557 did not dispute that the LC was specific and did not provide that a partial delivery take place on January 15. Moreover, the Agreement did not contain a "no waiver” clause prohibiting oral modification and under this particular transaction no consideration is required in lieu of modification (see, e.g., UCC 2-209 [1] [an agreement modifying a contract within this article needs no consideration to be binding]; CT Chems. [U.S.A.] v Vinmar Impex, 81 NY2d 174 [modified contract required payment by letter of credit]). Furthermore, testimony and other evidence reveals no consensus among plaintiffs employees, Kelly Baker and Wirkus, with respect to whether Clark intended that there had to be a partial delivery of the cargo. Testimony from Aron’s witness, Eric Littman, was not materially contradicted by Baker’s deposition testimony, which was read into the record. He testified that he never discussed with Baker that amending the LC to January 17 would require that 150,000 barrels be delivered on or before January 15. Baker’s deposition testimony indicated that certain of her written notes, as opposed to her typed notes, may have contained information regarding whether a partial delivery was intended. The written notes were last seen in the possession of Baker’s supervisor, but they were not produced at trial and allegedly lost. Moreover, testimony revealed that as of January 12, 1990, Clark was aware that The Patricia would not likely be in New York harbor until January 15, with The Maersk to follow behind to lighter the 60,000 barrels. But, nothing in the record reveals that prior to January 15, Clark demanded that Aron deliver the 150,000 barrels on or before January 15, 1990.
The testimony of Clark’s witnesses was neither credible nor supported by the record. The parties’ course of conduct demonstrates that there was a modification of the delivery date, but that failure to deliver 150,000 barrels by January 15, 1990 was not a breach of the Agreement.
It is clear from the evidence that Clark agreed that upon tendering NOR the same constituted delivery within the delivery date. Clark complains that Aron did not tender proper NOR because it was not tendered directly to Clark. The Agreement and LC are silent as to how NOR is tendered from and to whom. The testimony, evidence, and the UCC provide guidance. The course of performance, as well as any course of dealing and usage of trade, shall be construed whenever reasonable as consistent with each other (UCC 2-208 [2]), and evidence of the course of dealing and performance and usage of trade may be employed to explain or supplement provisions of a *558 contract (UCC 2-202). There is no dispute that a vessel must be physically ready to load or discharge cargo before tendering NOR (see also, 2B Benedict, Admiralty, § 33, at 2-18 [7th rev ed 1997]). Contracts of charter contain key clauses, one being the notice of readiness. Here, Aron’s contract of charter contained the standard NOR provision. The NOR provision provides, in pertinent part, the customary practice of tendering NOR. It states the following: "Upon arrival at customary anchorage * * * the Master or his agent shall give the Charterer [Aron] or his agent [IMTT] notice * * * that the Vessel is ready to * * * discharge cargo, berth or no berth” (contract of charter 6). The provision dictated Aron’s course of performance with the owner of the vessel and also demonstrates the dealing and performance and usage of trade between Clark and Aron. There was no requirement under contract or custom of usage and trade for the Master of The Maersk to tender NOR to Clark. The Master was required to tender NOR to Aron, the charterer of the vessel (see, e.g., Shipping Corp. v Sun Oil Co., 569 F Supp 1248, 1255 [ED Pa 1983]). The record supports this finding. The testimony regarding industry practice and custom of the trade revealed that NOR can be tendered from a vessel about to discharge at a designated port or from a vessel about to lighter on to another vessel. Although the smaller vessel may not reach its destination within the delivery date, the initial tender of NOR will constitute timely delivery. Aron’s witness Gary McCarthy explained that a vessel with a draft larger than the port of destination has to be lightered. In this instance, the port of Albany had a draft limit that would have required any Boston-size vessel with 210,000 barrels to lighter before proceeding to Albany. He testified that upon tendering NOR, followed by lightering, proper NOR was tendered although the cargo did not reach the port of destination on time, as long as the NOR followed by lightering took place within the. delivery period. Here, the customary place to lighter would have been New York harbor. Therefore, assuming arguendo, that The Zina was permitted north of the George Washington Bridge, it would have had to lighter barrels on to a barge in order to proceed to Albany, and if it had not reached Albany until January 18, 1990, the delivery would have been timely under the terms of the Agreement and LC and industry practice and custom of the trade, because delivery was made at the time The Zina first lightered. The same is true as to The Maersk and The Patricia. Had The Maersk tendered NOR and lightered on to The Patricia on or before January 17, delivery *559 would be considered timely under the Agreement and LC and industry practice and custom of the trade, although The Patricia would not arrive in Albany until January 18, and although The Patricia was chartered by Aron. Delivery would also have been timely once The Maersk lightered on to The Patricia and thereafter lightered 60,000 barrels on to a barge or at IMTT after January 17. Plaintiffs expert’s testimony did not materially dispute McCarthy’s testimony. Clark’s contention that only a Boston-size vessel could tender proper NOR to any other vessel is devoid of merit. Neither the Agreement nor the LC provide that NOR must be tendered by a Boston-size vessel, but only that the vessel that delivered the cargo to Albany be a Boston-size vessel capable of entering the port of Albany or any other port with a similar draft.
Clark’s conduct after declaring breach constituted an absolute renunciation of the Agreement and a breach of contract for which Clark is liable in damages (MK W. St. Co. v Meridien Hotels, 184 AD2d 312). Aron was entitled to treat the Agreement as terminated and then seek to mitigate its damages by arranging a substitute transaction with another entity promptly after repudiation (see, Wilmot v State of New York, 32 NY2d 164; Saboundjian v Bank Audi [USA], 157 AD2d 278; O’Hare v General Mar. Transp. Corp., 564 F Supp 1064, affd 740 F2d 160, cert denied 469 US 1212 [when a party to a contract has repudiated the agreement then the other party need no longer satisfy conditions that might otherwise be required of it]). While the LC was contemplated by the Agreement, it was an independent contract (Foreign Venture Ltd. Partnership v Chemical Bank, 59 AD2d 352, 355). The repudiation of the Agreement did not work to repudiate the LC (UCC 5-106 [2] [once LC is established as regards the beneficiary it can be modified or revoked only with his or her consent]). It is a separate agreement between the issuing bank, BP and the beneficiary, Aron (Royal Bank v Weiss, 172 AD2d 167; Phibro Distribs. Corp. v Fidelity Intl. Bank, 175 AD2d 777, lv denied 79 NY2d 755). Under the doctrine of independent contracts, BP’s obligation to honor the LC is separate and independent from BP’s obligations to Clark under the reimbursement agreement, and separate and independent from any obligation of Aron to Clark under the Agreement. Unless Clark moved for injunctive relief (but cf., UCC 5-114), which it did not do, BP was not required to resolve the disputes or questions of fact concerning the underlying transaction (First Commercial Bank v Gotham Originals, 64 NY2d 287; see also, United Bank v *560 Cambridge Sporting Goods, 41 NY2d 254, 259, supra; cf., Ross Bicycles v Citibank, 161 Misc 2d 351). In short, Clark repudiated the Agreement and Clark cannot state a cause of action for wrongful draw on the LC.
Both parties sought to demonstrate at trial that the other acted in bad faith. Clark condemns Aron for drawing down on the LC claiming it had properly declared a breach and did not have to cooperate thereafter. Aron denounces Clark in its failed attempt to engineer a cancellation based on untimely delivery and walking away from the Agreement that was very profitable for the defendant, but a bad bargain for the plaintiff. Here, the Agreement was repudiated by Clark and yet it seeks to hold Aron in breach of the Agreement it repudiated on the ground that the draw on the LC was wrongful. Clark’s expert witness’s position at trial was that Aron had no right to discharge the cargo and draw on the LC and that the proper way to have handled the situation, if Clark improperly declared a breach, was for Aron to hold on to the cargo and dispose of it on the market. Aron then could have commenced litigation seeking damages from Clark, but Aron should not have forced the oil in IMTT then draw down on LC.
When there has been a breach of a contract, the law imposes a duty on the nondefaulting party to make reasonable efforts to reduce or extinguish the damage (see, e.g., Losei Realty Corp. v City of New York, 254 NY 41). Had Aron, after discharging the cargo and demanding payment from Clark, elected to sell the cargo to third parties it would have been able to seek damages from Clark for the difference between what it received as the resale price and what it would have received as the contract price (UCC 2-708 [seller’s damages for nonacceptance or repudiation]; see also, Fertico Belgium v Phosphate Chems. Export Assn., 120 AD2d 401, affd as mod 70 NY2d 76; Tesoro Petroleum Corp. v Holborn Oil Co., 145 Misc 2d 715). Aron, however, decided to perform after Clark declared a breach. Aron’s expert testified that drawing on a LC, although the underlying agreement was repudiated by Clark, was commercially reasonable. In essence, Aron argues why should a merchant wait the result of future litigation after a breach by the other merchant if he or she can obtain a similar, if not, exact result soon after the breach by drawing on a separate letter of credit. Aron argues that drawing on the LC was a reasonable remedy.
"Remedy” is broadly defined under the UCC to mean "any remedial right to which an aggrieved party is entitled with or *561 without resort to a tribunal” (UCC 1-201 [34]). "Remedies for breach of any obligation or promise collateral or ancillary to a contract for sale are not impaired by the provisions of [the UCC]” (UCC 2-701). "The purpose is to make it clear that both remedy and rights (as defined) include those remedial rights of 'self help’ which are among the most important bodies of rights under [the UCC]” (UCC 1-201, Comment 34). The remedies provided by the UCC are to be liberally administered. The purpose is to place the aggrieved party in as good a position as if the offending party had fully performed (UCC 1-106). When Clark declared a breach Aron could resort to any remedy for breach provided for under the UCC and under principles of law and equity (UCC 1-103, 2-610 [b]; 2-703, 2-710). Under the UCC, Aron could either, among other things, withhold delivery, stop delivery, resell and recover damages or recover damages for nonacceptance or in a proper case the price (UCC 2-703, 2-705, 2-706, 2-708, 2-709). As discussed, all contracts imply good faith and fair dealing (O’Neil Supply Co. v Petroleum Heat & Power Co., 280 NY 50). UCC 2-103 defines good faith between merchants to include the observance of reasonable commercial standards of fair dealing in the trade (Atlas Auto Rental Corp. v Weisberg, 54 Misc 2d 168; Hubbard v UTZ Quality Foods, 903 F Supp 444). Here, Aron could not elect to perform under the Agreement after it was repudiated by Clark. The election to continue performance requires that the other party come back to the table to fulfill its obligations. The election keeps the contract alive for both parties (see generally, 22A NY Jur 2d, Contracts, § 429, at 112). Here, Clark unequivocally refused to perform after January 15. Aron’s reliance on UCC 2-311 (3) to support the contention that it could continue to perform its obligations under the Agreement, albeit modified, is misplaced. Section 2-311 contemplates that the second party has not repudiated in order for the first party to proceed to perform in any reasonable manner (see, UCC 2-311, Comment 3). This is not an instance where from the inception of the parties’ relationship there was no contract (but cf., American-European Art Assocs. v Trend Galleries, 227 AD2d 170). Under the Agreement, as opposed to the separate LC, Clark’s breach did not render moot the implied covenant of good faith and fair dealing as to the nonbreaching party, Aron. Implicit in the covenant of good faith and fair dealing is the promise to act rationally in exercising discretion (see, e.g, Dalton v Educational Testing Serv., 87 NY2d 384). Clark’s repudiation of the Agreement did not extinguish Aron’s implied duty to perform *562 in good faith the exercise of discretion in electing the remedial measures available to mitigate against Clark’s breach. Neither principles of contract law nor the provisions of the UCC, short of an action for specific performance (UCC 2-716 [buyer’s right to specific performance where goods are unique]), provide the remedy of unilateral performance by one merchant where the other has repudiated it. Although Aron’s draw on the LC was not a breach of the LC, Aron breached the implied covenant of good faith and fair dealing under the Agreement because it should have mitigated against Clark’s breach as provided under the UCC. The facts here are exceptional and warrant the result as well as furthers the policy considerations with respect to the duties of the nonbreaching merchant to mitigate against the other merchant’s breach. Although there has been a breach by Aron, it was not material. No damages flowed to Clark as a result of Aron’s breach. Clark’s breach in the first instance entitled Aron to cover the entire contract price subject to set-off. Aron’s decision to draw on the LC short-circuited its need to litigate the matter and to ultimately recover the contract price under the Agreement, which it could have recovered had it not decided to draw on the LC. In short, Clark would have presently paid more to Aron (and with interest) than what it was caused to pay under the LC.
When Clark breached the Agreement, Aron was entitled to damages. Until the time Aron decided to draw on the LC it acted reasonably in discharging the cargo and storing it at IMTT and then presenting an invoice to Clark for payment. Had Aron litigated Clark’s breach and not drawn on the LC it would have been entitled to recover the entire contract price because it would have been able to discharge the entire 210,000 barrels without the time limitation imposed under the LC. Because of Aron’s decision to discharge the cargo on the assumption that it had the right to continue performance under the Agreement, but collect only under the LC, it cannot now reap the benefit of recovery of the balance of the unpaid contract price under the Agreement. Aron’s decision to draw on the LC works to bar it from collecting the contract price, less the amount received under the LC, because it did not elect to mitigate under the Agreement.
Aron’s breach did not waive Clark’s breach. This is not an instance where Clark subsequently rejected its repudiation and decided to perform under the Agreement. Moreover, Aron’s efforts proved unsuccessful in convincing Clark to perform and the benefit Aron received was not from the Agreement, but *563 from the LC, a separate agreement with BP (see generally, 22A NY Jur 2d, Contracts, § 430, at 112-113 [waiver of breach]). Aron’s nonmaterial breach did not work to waive Clark’s material breach. Clark’s remaining contentions are of no moment.
Aron’s first counterclaim seeks to recover the deviation costs incurred by The Zina and the freight differential from Boston to New York. The deviation of The Zina was a contract right and the result of the initial restriction on The Zina. Aron is not entitled to those costs. Under the Agreement Aron is entitled to recover $29,585.06 for the additional freight costs. The second counterclaim for costs to charter The Patricia, plus lighterage fees is not recoverable. Aron volunteered to facilitate delivery to Albany by agreeing to charter The Patricia and the costs were not incidental to Clark’s breach, but would have been incurred had Clark performed. The third counterclaim for costs in deviating The Maersk to Delaware is also not recoverable for the same reason as the second counterclaim. The fourth counterclaim for costs incurred at IMTT were incidental to Clark’s breach and Aron is entitled to recover $63,866.67. The fifth counterclaim for storage costs incurred at IMTT from January 18 until February 3, 1990 is not recoverable. Aron notified Clark that it would begin to charge storage costs effective January 29, 1990, and failed to set forth the exact costs incurred between January 29 and February 3, 1990. Nevertheless, in view of the $150,000 setoff it is a moot issue. Lastly, the sixth counterclaim to recover the difference between the contract price and the market price for the gasoil that Aron claims it could have delivered, but for Clark’s breach is not recoverable where, as here, Aron drew on the LC to mitigate its injury rather than mitigate its injury under the Agreement.
Accordingly, Clark has failed to prove its case. Defendant’s counterclaims are granted in part, but in view of the $150,000 setoff a balance of zero remains.