**3COM CORPORATION, Plaintiff,**

v.

**BANCO DE BRASIL, S.A., Defendant.**

No. 97 Civ. 3819(SS).

United States District Court,
S.D. New York.

April 3, 1998.

Moses & Singer LLP, New York City, David Rabinowitz, Michael Evan Avidon, Michael J. Richter, for Plaintiff.

Wang & Wang, San Francisco, CA, Francis S.L. Wang, for Defendant.

## OPINION AND ORDER

SOTOMAYOR, District Judge.

Plaintiff, 3Com Corporation ("3Com"), moves for summary judgment pursuant to Fed.R.Civ.P. 56 on its cause of action for wrongful dishonor of a standby letter of credit issued by defendant, Banco de Brasil S.A. ("Banco"). Defendant cross-moves for summary judgment. For the reasons to be discussed, plaintiff's motion for summary judgment is granted, and defendant's cross-motion for summary judgment is denied.

## BACKGROUND

3Com, a Delaware Corporation with its principal place of business in California, sells and licenses computer hardware and software. In October 1993, 3Com entered into a distributor agreement with Comp Service Ltd. ("Comp Service"), a Brazilian company, and Expasa Florida Inc., whereby Comp Service became an authorized distributor of 3Com's computer products in Brazil; Expasa Florida Inc. was Comp Service's purchasing agent in the United States. In June 1994, Comp Service notified 3Com that Techtrade Export ("Techtrade") would be replacing Expasa Florida as its purchasing agent, and Techtrade would assume Expasa's obligations. In October 1994, Comp Service signed a guaranty in which it guaranteed the payment and performance of Techtrade's obligations to 3Com. The guaranty also contained clauses in which Comp Service agreed to direct liability to 3Com and in which Comp Service waived "any demand for payment or performance or notice of non-payments or non-performance, or notice of default."

In November 1994, Comp Service arranged for Banco to issue a standby letter of credit to support payment of Comp Service's obligations to 3Com. On November 21, 1994, Banco issued an irrevocable standby letter of credit in the amount of $250,000 with 3Com as the beneficiary. 3Com was notified of the letter of credit by Bank of America, the advising bank.

The standby letter of credit, as amended in December 21, 1994, contained the following relevant terms. The letter of credit required Banco to "make payment on sight" upon 3Com presenting a draft and a statement "that the amount of the draft which this statement accompanies will be applied by us to indebtedness due and owing Comp Service Ltda. for invoices which Comp Service Ltda. defaulted on the payments terms to 3Com Corp." The letter of credit contained an original expiration date of May 20, 1995. However, the letter of credit automatically renewed itself, without written amendment, on each successive calendar year unless Banco sent 3Com "written notice that we have elected not to renew the letter of credit beyond such date." Drawings on the credit could occur up to the expiry date. Additionally, the letter of credit by its terms was subject to the Uniform Customs and Practice for Commercial Documentary Credits (1993 Revision), International Chamber of Commerce Publication No 500 ("UCP").

The letter of credit renewed automatically on May 20, 1995 until May 20, 1996. Between July 1995 and April 1996, Banco sent three telexes to Bank of America which requested Bank of America to "please obtain authorization to cancel a/m standby." After receipt of each of these telexes, Bank of America notified 3Com of Banco's request. Each time 3Com denied Banco's request for cancellation.

On May 13, 1996 [1], seven days before the May 20 expiration date, Banco sent the following telex to Bank of America stating in pertinent part:

> YOUR STANDBY L/C NBF.LASB 222099 OUR GUARANTEE NBR.GBT 2681001696 USD 250,000.00 FAVORING 3COM CORP., SANTA CLARA, CA REQUESTED BY COMP SERVICE LTDA., SAO PAOLO, SP PLS CANCEL A/M STANDBY L/C AND RELEASE U.S. FROM LIABILITIES REGARDING A/M GUARANTEE.

1. The Court notes that in the parties' papers, 3Com states that the telex was dated May 10, 1996, while Banco states that it was dated May 13, 1996. Because the exact date is not a material fact in this case and is not relevant to the Court's decision, the Court will refer to this telex as the May 13 telex.

On June 13, 1996, over two weeks after the May 20 expiration date, Banco sent another telex to Bank of America stating: "A/M STANDBY WAS PREVIOUSLY DUE ON MA120[sic], 1995 AND AUTOMATICALLY RENEWED UNTIL MAY 20, 1996. PLEASE CONSIDER OUR SWIFT MT 799 DD 96MAI13(sic) AS A NOTICE OF TERMINATION AND RELEASE U.S. FROM LIABILITIES." Bank of American subsequently sent a letter to 3Com on June 17, 1996 advising 3Com of Banco's request to "have the letter of credit canceled." 3Com responded that it did not wish to have the letter of credit canceled. Bank of America sent a telex to Banco dated July 6, 1996, which stated:

> FURTHER TO YOUR REQUEST FOR CANCELLATION OF ABOVE REFERENCED LETTER OF CREDIT WE WISH TO INFORM YOUR [sic] THAT BENEFICIARY DECLINES YOUR REQUEST. SUBJECT LETTER OF CREDIT IS THEREFORE IN FULL FORCE AND EFFECT UNTIL MAY 20, 1997 OR ITS FUTURE EXPIRATION DATE AS LONG AS AUTOMATIC RENWAL [sic] CLAUSE IS IN EFFECT. PLEASE BE GUIDED ACCORDINGLY.

Banco's reply to Bank of America's telex on July 11, 1996 stated that Banco's May 13 telex requesting cancellation corresponded to a notice of termination; therefore, automatic renewal of the letter of credit could not be accepted. Bank of America subsequently advised Banco that Banco's May 13 telex was a request for cancellation, not a notice of cancellation. Because 3Com rejected Banco's cancellation request, Bank of America maintained that the letter of credit was still in effect.

In March 1996, 3Com had issued two invoices exceeding $250,000 for goods sold to Techtrade and Comp Service. The invoices were not paid when due. On July 19, 1996, 3Com drew on the letter of credit by submitting a draft of $250,000 and the accompanying statement with the language required by the letter of credit. In August 1996, Banco gave 3Com a notice of dishonor of the draw, stating that the letter of credit had expired and that 3Com had not issued any invoices to

Comp Service. On May 9, 1997, 3Com again submitted a draw on the letter of credit by submitting a draft and an accompanying statement. On May 15, 1997, Banco again gave notice of dishonor of 3Com's draft, claiming that the letter of credit had been canceled since May 20, 1996. Plaintiff subsequently brought this suit against Banco for wrongful dishonor.

## DISCUSSION

Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A court's role on a motion for summary judgment is "not to resolve disputed issues of fact but to access whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Insurance Co.,* 804 F.2d 9, 11 (2d Cir.1986) (citing *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party satisfies this burden, the nonmoving party must then come forward with "specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). If a court determines that the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Porky Products v. Nippon Express U.S.A. Inc.,* 1997 WL 481618, at *2 (S.D.N.Y.1997) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted)). When there are cross-motions for summary judgment, a court must use the same standards as for individual motions. *See Aviall Inc. v. Ryder System Inc.,* 913 F.Supp. 826, 828 (S.D.N.Y.1996) (citing *Heublein Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir.1993)).

Before the Court addresses the summary judgment issues, a brief review of letter of credit law is relevant. A letter of

credit is one of three distinct relationships involved in a letter of credit transaction: (1) the underlying contract for the purchase and sale of goods between the buyer (account party) and the seller (beneficiary); (2) the agreement between the buyer and its bank (issuing bank) describing the terms which must be incorporated into the letter of credit and the terms for reimbursement, and (3) the letter of credit in which the issuing bank promises to pay the beneficiary when the latter presents appropriate documents which conform to the letter of credit. *See Alaska Textile Co. Inc. v. Chase Manhattan Bank N.A.*, 982 F.2d 813, 815 (2d Cir.1992). The law is clear that each of the three relationships constitutes a separate and independent contract. *See id.* at 815.

■ The issuing bank's duty to honor the draws submitted by the beneficiary under the letter of credit is independent of any obligation of the buyer and seller in the underlying contract. *See All Service Exportacao, Importacao Comercio, S.A. v. Banco Bamerindus Do Brazil S.A.* 921 F.2d 32, 34 (2d Cir.1990), *Marino Ind. Corp. v. Chase Manhattan Bank N.A.*, 686 F.2d 112, 115 (2d Cir.1982) ("It is the complete separation between the underlying commercial transaction and the letter of credit that gives the letter its utility in financing transactions."). The issuing bank has the duty to pay the beneficiary when the beneficiary submits the necessary documents in accordance with the letter of credit terms. *See All Service*, 921 F.2d at 34.

■ Because this case is based upon diversity jurisdiction, the Court is obligated to follow the choice-of-law rules of the forum state, in this case New York. *See Wm. Passalacqua Builders Inc. v. Resnick Developers South Inc.*, 933 F.2d 131, 136 (2d Cir.1991), *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Where the parties have impliedly consented to the use of the forum law, their consent is sufficient to establish choice-of-law. *See American Fuel Corp. v. Utah Energy Development Co.*, 122 F.3d 130, 133 (2d Cir.1997) (where the parties' briefs relied on New York law, New York law applied), *In Matter of Arbitration between Tehran–Berkeley Civil and Environmental Engineers and Tippetts–Abbett–McCarthy–Stratton*, 888 F.2d 239, 242 (2d Cir.1989) (where the contract was performed in Iraq, but the parties' briefs relied on New York law, New York law applied). Here, although the letter of credit was issued in Brazil and performance was to be in California, the parties' briefs relied on New York law. Therefore, the Court will apply New York law to resolve the dispute.

■ Here the terms of the letter of credit stated that it was to be governed by the UCP. Under New York Uniform Commercial Code section 501–2(4), when a letter of credit states by its terms that it is subject to the UCP, Article 5 of the UCC does not apply. Where the UCP is silent or ambiguous, however, courts may draw analogies to the UCC or pre-code case law if they are not in conflict with the purposes of the UCP. *See Weyerhaeuser Co. v. Israel Discount Bank of New York*, 872 F.Supp. 44, 46 *Algemene Bank Nederland, N.V. v. Soysen Tarim Urunleri Dis Ticaret Ve Sanayi, A.S.*, 748 F.Supp. 177, 181 (S.D.N.Y.1990); *United Bank Ltd. v. Cambridge Sporting Goods Corp.*, 41 N.Y.2d 254, 258 n. 2, 392 N.Y.S.2d 265, 269 n. 2, 360 N.E.2d 943 (1976); *Canadian Imperial Bank of Commerce v. Pamukbank Tas*, 166 Misc.2d 647, 654, 632 N.Y.S.2d 918, 922 (Sup Ct.1994). In general, under New York law, letters of credit are governed by the same principles as apply to all other written contracts. *See J. Zeevi & Sons v. Grindlays Bank (Uganda)*, 37 N.Y.2d 220, 225, 371 N.Y.S.2d 892, 897, 333 N.E.2d 168 (1975); *Barclay Knitwear Co., Inc. v. King'swear Enterprises, Ltd.*, 141 A.D.2d 241, 246, 533 N.Y.S.2d 724, 727 (1st Dep't 1988).

■ Under UCP Article 42(a), "[a]ll Credits must stipulate an expiry date." Prior to the letter of credit's expiration date, the issuing bank has an absolute obligation to pay the beneficiary who has complied with the terms of the letter of credit. *See Todi Exports v. Amrav Sportswear Inc.*, 1997 WL 61063, at *4 (S.D.N.Y.1997). However, after the letter of credit has expired, the issuing bank no longer has the obligation to pay.

See *B.E.I. International Inc. v. Thai Military Bank,* 978 F.2d 440, 442 (8th Cir.1992) (noting that strict regard for the expiration dates in a letter of credit is "critical to their continuing commercial viability").

## A. *Notice of Non–Renewal*

The letter of credit at issue contained the following "evergreen clause": "[the letter of credit] shall be automatically extended, without written amendment, on such successive calendar year unless we [Banco] send you [3Com] *written notice that we have elected not to renew the letter of credit beyond such date.*"(emphasis added). The parties dispute the interpretation of the highlighted language.

The parties both agree that Banco sent a May 13 telex to 3Com stating: "Please cancel the standby letter of credit and release us from liabilities." However, the parties dispute whether this telex was an "election not to renew" as required by the letter of credit. In support of its motion for summary judgment, 3Com contends that Banco's telex of May 13, 1996 was not a notice of non-renewal but, instead, was a request for cancellation which required 3Com's approval to become effective. Because Banco's telex was not an adequate notice of non-renewal, 3Com argues that the letter of credit renewed itself on its own terms on May 20, 1996, and Banco was therefore required to pay on the draws which 3Com submitted.

Banco, in opposition, argues that the language of its May 13 telex was a notice of non-renewal in compliance with the letter of credit. In support of its position, Banco contends that the term "cancel" according to its plain meaning is equivalent to the term "terminate." Additionally, Banco states that the language of its May 13 telex was different from that of the three telexes it had sent previously in which it asked 3Com's permission to "cancel" the letter of credit. According to Banco's argument, the May 13, 1996 telex terminated the letter of credit on the May 20, 1996 expiration date, and Banco's refusal to honor the draws submitted by 3Com after May 1996 was therefore appropriate.

■ Before the Court can resolve whether the May 13 telex terminated the letter of credit, the Court must decide what level of notice was required. The parties propose different standards. 3Com argues that notice of "non-renewal" must be "clear and unequivocal." Banco, on the other hand, argues that notice only has to be "reasonable." The parties, in effect, disagree over whether a communication which could be reasonably construed either as a notice of nonrenewal or not constitutes sufficient notice to terminate the letter of credit. Put another way, which party bears the risk of ambiguity? For the following reasons, the Court finds that this risk is properly placed on the issuing bank, either as a matter of interpreting the parties' contract for the letter of credit or as a matter of New York law.

Turning to the letter of credit itself, it is clear the parties did not expressly allocate this risk—i.e., they did not specify in so many words any requirement for the notice of nonrenewal except that it be in writing. The letter of credit, however, does expressly incorporate the terms of the UCP, and thus it is proper for the Court to look to the UCP for guidance. However, the UCP is silent with respect to notice for non-renewal of a letter of credit This silence can be explained by the silence of the UCP regarding "evergreen" clauses. Although the UCP discusses both revocable and irrevocable letters of credit, it does not discuss irrevocable letters of credit with "evergreen" clauses. Notwithstanding the UCP's silence directly on the point in controversy, the Court believes that the parties, by incorporating the terms of UCP, also incorporated the general principles and policies which underlie the UCP's express terms, and that the Court may interpret "notice"—i.e ., imply the omitted term of who bears the risk of ambiguity—by reference to these policies. *See Columbus Park Corp. v. Department of Housing Preservation and Development,* 80 N.Y.2d 19, 27, 586 N.Y.S.2d 554, 558, 598 N.E.2d 702 (1992) (courts must give contracts a fair and reasonable interpretation consistent with its purposes), *see also* E. Allan Farnsworth, *Contracts* 547 ("A recital or provision dealing with a related case may suggest the parties' intention with respect to the omitted case").

Therefore, the Court must consider the general intent behind the relevant provisions of the UCP.

Article 12 of the UCP discusses the issue of "incomplete or unclear instructions" as it relates to "advising, confirming or amending" a letter of credit. UCP 12 states that a "credit will be advised, confirmed or amended only when complete and clear instructions have been received. . . ." Additionally, Article 5 of the UCP requires that "instructions . . . for the credit itself, instructions for an amendment thereto, and the amendment itself, must be complete and precise." From both of these sections, it is apparent that businesses engaged in letter of credit transactions expect precision and clarity in terms and instructions relating to the letter of credit. *See* Burton v. McCullough, *Letters of Credit* § 4.02[2][c] (1997) ("A letter of credit must be 'complete and precise,' yet still *avoid* excessive detail. In each instance the issuer must take the initiative to be precise or pay the consequences."). Therefore, by analogy, if an irrevocable credit cannot be "amended" without clear notice, an instruction such as a notice of termination should require clear notice.

Moreover, the UCP expresses a strong preference for firm expiry dates. Article 42 of the UCP specifies not only that all credits must stipulate an expiry date, but that banks should strongly discourage the use of durational terms such as "for one month" instead of specifying a date certain. *See* UCP Article 42(a), (c). Courts, likewise, interpret the UCP as requiring strict compliance with expiry dates—i.e., parties are not expected to figure out whether a presentation is "close enough" to the expiry date. *See, e.g., Todi Exports v. Amrav Sportswear, Inc.,* No. 95 Civ. 6701, 1997 WL 61063, at *4–5, 1997 U.S. Dist. Lexis 1425, at * 13–16 (S.D.N.Y.1997). The thrust of the UCP in this regard, as it is generally, is that there should be no confusion or ambiguity as to whether a document is timely. *See* John F. Dolan, *The Law of Letters of Credit* ¶ 5.03[3][e] (1996) ("Issuers must know when their obligations expire. . . . Drafters must take care that the expiration provision in the credit is clear."). The only interpretation of notice of nonrenewal consistent with this purpose is to require that the notice be clear and unambiguous—i.e., not susceptible to different reasonable interpretations.

Finally, the Court notes that there was at least some express allocation of risk in the evergreen clause—namely, in the placement of the burden of nonrenewal on Banco. Banco could easily have chosen to issue a letter of credit with a fixed term, or Banco could have chosen to place the requirement on 3Com to trigger renewal with some affirmative act of notification. Despite these options, Banco chose to make the renewal automatic unless Banco acted to prevent it—i.e., placing upon itself the risk that it would (for whatever reason) fail to give notice and thereby allow automatic renewal. It seems unlikely that Banco would have intended to take all the risks except for one—namely, the risk of ambiguity. At the very least, it is more sensible, in the absence of express provisions to the contrary, to place that risk where the parties placed all the other risk.

Alternatively, even if it could not be said that, by incorporating the terms of the UCP, the parties themselves had placed a burden of clear communication on Banco, the Court believes that such a requirement should be imposed as a matter of law. The Court notes that New York courts have apparently never addressed this exact issue, but the Court believes, based on analogous provisions of New York law, that the New York Court of Appeals would, if faced with the question, rule that notice of nonrenewal of an evergreen letter of credit must be clear and unambiguous. *See In re Joint Eastern and Southern Dist. Asbestos Litig.,* 78 F.3d 764, 776 (2d Cir.1996) ("The district court faced with unclear state law is required to 'determine what it believes [the] state's highest court would find if the issue were before it . . .' ") (quoting *Plummer v. Lederle Laboratories,* 819 F.2d 349, 355 (2d Cir.1987)).

A "clear and unequivocal" notice standard is consistent with the standard of "strict compliance" which New York law requires in letter of credit transactions. *See United Commodities–Greece v. Fidelity Int'l Bank,* 64 N.Y.2d 449, 455, 489 N.Y.S.2d 31, 33, 478 N.E.2d 172 (1985), *Bank of Seoul v. Norwest*

*Bank Minnesota,* 218 A.D.2d 542, 543, 630 N.Y.S.2d 520, 521 (1st Dep't 1995). Strict compliance requires that documents submitted under the letter of credit strictly comply with the letter of credit's terms. *See Venizelos S .A. v. Chase Manhattan Bank,* 425 F.2d 461, 465 (2d Cir.1970) ("[T]he essential requirements of a letter of credit must be strictly complied with by the party entitled to draw against the letter of credit, which means that the papers, documents and shipping descriptions must be as stated in the letter."); *International Fidelity Insurance Co. v. State Bank of Commerce,* 1988 WL 59853, at *2 (W.D.La.1988) ("notification of election not to renew must be in the manner required by the letter of credit").

A corollary to this strict compliance standard under New York law is that requirements of the letters of credit must be explicit. *See Marino v. Chase Manhattan Bank,* 686 F.2d 112, 115 (2d Cir.1982). Moreover, if the terms of the letter of credit are ambiguous, that ambiguity is construed against the issuer, at least where, as here, the issuer drafted the letter. *See Bouzo v. Citibank, N.A.,* 96 F.3d 51, 57 (2d Cir.1996), *Marino,* 686 F.2d at 115; *Venizelos,* 425 F.2d at 466 ("[A]s between the beneficiary of a letter of credit and the issuer ... if ambiguity exists, the words are taken as strongly against the issuer as a reasonable reading will justify."). The policies of strict compliance and strict construction in letter of credit law (as opposed to the more relaxed "substantial compliance" standard of general contract law) "reflect[ ] the practicalities and needs of the commercial and financial community." *Marino,* 686 F.2d at 115; *see also First Commercial Bank v. Gotham Originals, Inc.,* 64 N.Y.2d 287, 297–98, 486 N.Y.S.2d 715, 721, 475 N.E.2d 1255 (noting value of letters of credit lie in their predictability). Following this policy, any notices submitted under a letter of credit should also be unambiguous. If any ambiguities exist, the ambiguities should be construed against the party that drafted the notice. *See* Dolan, ¶ 5.03[1] ("There are some credits that are revocable only upon certain specified conditions. In these cases, courts should require strict compliance with the credit's conditions for revocation, just as they generally require strict

compliance by a beneficiary of the credit conditions for payment."). Finally, the Court notes that because the "clear and unequivocal" standard is consistent with current letter of credit law and policies, the use of this standard in this case is not unfair to the parties. *See Toyota Tsusho Corp. v. Comerica Bank,* 929 F.Supp. 1065, 1074 (E.D.Mich. 1996) (because the parties were sophisticated parties and aware of the strict compliance rules governing LOCs, "the application of a strict notice rule in this case comport[ed] with fundamental principles of fairness.").

■ Applying the "clear and unequivocal" standard to this case, the Court concludes that, as a matter of law, the notice of non-renewal provided by Banco was not clear and unequivocal, and could easily—in fact, most easily—have been construed as a request for immediate cancellation. Banco may be correct in its assertion that, in most contexts, "cancel" encompasses the meaning "terminate." However, in this situation, there were two types of "terminations" envisioned by the letter of credit—namely, an immediate termination which required 3Com's approval, and a nonrenewal which did not. In its three telexes prior to the May 13 telex at issue here, Banco had used the term "cancel" exclusively to refer to the former; thus, it was eminently reasonable for 3Com and Bank of America to ascribe that same meaning to the word "cancel" in the May 13 telex. *Cf. Studley v. National Fuel Gas Supply Corp.,* 107 A.D.2d 122, 128, 485 N.Y.S.2d 880, 884 (4th Dep't 1985) ("the practical construction put on a contract by the parties in performing under it is of great importance in determining its meaning"); Restatement (Second), Contracts § 202(4) & cmt. g ("The parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning.").

Banco argues that because the last telex did not request 3Com's approval, it was clear that Banco was terminating the letter of credit. The Court does not agree, because Banco still used the same word, "cancel," used in its previous telexes. Additionally, Banco's argument that the timing of the telex provided 3Com with sufficient notice that the telex was a notice of non-renewal is also

insufficient. Looking at the plain language of the letter of credit, Banco could have provided 3Com with either a notice of non-renewal or a request for cancellation at any time prior to the next expiration date.

Finally, it is also apparent from Banco's own papers that Banco thought the May 13 telex was unclear: On June 13, 1996, Banco submitted another telex to 3Com which stated "please consider our May 13 telex as a notice of termination." Therefore, because Banco has failed to present evidence to show how their notice of May 13 was "clear and unequivocal", the Court grants plaintiff's motion for summary judgment, and denies the defendant's cross-motion.

## B. *Fraud in the Transaction*

■ Fraud is an exception to the rule that banks must pay a beneficiary under a letter of credit when the beneficiary submits documents that conform on their face to the letter of credit. *See Semetex Corp. v. UBAF Arab American Bank,* 853 F.Supp. 759, 773 (S.D.N.Y.1994). However, the fraud defense is a narrow one, and is available only in limited situations such as: 1) where the beneficiary's demand for payment has no basis in fact; or 2) where the beneficiary's conduct has "so vitiated the entire transaction that the legitimate purposes of the independence of the issuer's obligation would be no longer served." *Itek Corp. v. First National Bank of Boston,* 730 F.2d 19, 25 (1st Cir.1984) (quoting *Roman Ceramics Corp. v. Peoples National Bank,* 714 F.2d 1207, 1212 n. 12, 1215 (3d Cir.1983) (citations omitted)). The fraud in the transaction defense "marks the limit of the generally accepted principle that a letter of credit is independent of whatever obligation it secures ... The logic of the fraud exception necessary entails looking beyond the supporting documents.... [w]e must look to the circumstances surrounding the transaction and the call to determine whether [the] call amounted to outright fraudulent practice." *Rockwell Intl. Systems Inc. v. Citibank N.A .,* 719 F.2d 583, 588–589 (2d Cir.1983).

■ Here the letter of credit required that 3Com submit the following statement with its draw: "The amount of the draft which this statement accompanies will be applied by us to indebtedness due and owing by Comp Service Ltda. for invoices which Comp Service Ltda. defaulted on the payment terms to 3Com Corp." In support of its motion, 3Com contends that the letter of credit did not limit itself to invoices made out in Comp Service's name. Instead, 3Com argues that the letter of credit applied to all debt due and owing by Comp Service for which Comp Service defaulted. According to 3Com, Techtrade had defaulted on two invoices exceeding $250,000. Because Comp Service had guaranteed all of Techtrade's obligations, 3Com contends that there was "indebtedness due and owing by Comp Service." Because 3Com's statement was in strict compliance with the letter of credit, and debt was owing by Comp Service, 3Com argues that its draws were not fraudulent.

In support of its cross-motion, Banco claims that the language of the letter of credit was clear. According to Banco, the letter of credit applied only to those invoices made out in the name of Comp Service and submitted to Comp Service for payment. Banco argues that invoices were never sent to Comp Service and additionally, the invoices at issue were made out to the name of Techtrade, not to Comp Service. Therefore, Banco's argument is that there was no "indebtedness due and owing by Comp Service for which Comp Service defaulted." Banco contends that 3Com knew that Comp Service itself did not default on any invoices, and for that reason, 3Com's draws on the letter of credit were fraudulent.

The Court first concludes that the language of the letter of credit is ambiguous as to what invoices are covered by the letter of credit. The language of the letter of credit is not clear as to whether the invoices had to be in Comp Service's name in order for 3Com to make a valid draw. When an ambiguity exists in a letter of credit, the ambiguities are construed against the drafter. See *Continental Grain Company v. Meridien International Bank Ltd.,* 894 F.Supp. 654, 659 (S.D.N.Y.1995); *Marino,* 686 F.2d at 115. In construing the ambiguities against Banco, the Court notes that 3Com's statement strictly complied with the language required

by the letter of credit. Therefore, 3Com's statements would have been proper if there was indebtedness due and owing by Comp Service. 3Com has provided in its papers that Techtrade had defaulted on invoices exceeding $250,000. Although those invoices were made out in the name of Techtrade, 3Com has also provided evidence that Comp Service had guaranteed any default of Techtrade. Additionally, according to the guaranty provided with 3Com's papers, Comp Service had waived the presentation of any invoices to Comp Service in the event of Techtrade's default. Therefore, given the terms of the underlying contract and the guaranty, 3Com has provided sufficient evidence to establish that Comp Service was responsible for the default on the invoices. In response, Banco has failed to present any evidence to establish that Comp Service was not responsible for this debt.

Additionally, Banco has failed to present sufficient evidence to show that 3Com had the intent to defraud when it submitted the draws. Under New York law, "fraud in the transaction is limited to instances of active intentional fraud." *410 Sixth Ave. Foods, Inc. v. 410 Sixth Ave.*, 197 A.D.2d 435, 436, 602 N.Y.S.2d 835, 836 (1st Dep't 1993). Banco relies on language of the letter of credit to support its claim, but as the Court has noted, the letter of credit's language is ambiguous. Rather, 3Com has provided sufficient evidence that it acted reasonably and in good faith in drawing on the letter of credit. Because Banco has failed to demonstrate that a material fact exists on the fraud affirmative defense, the plaintiff is entitled to judgment as a matter of law. The Court therefore grants plaintiff's motion for summary judgment on the fraud affirmative defense and denies defendant's cross-motion.

## CONCLUSION

For the reasons discussed above, the Court GRANTS plaintiff's summary judgment motion and DENIES the defendant's cross-motions. The parties are directed to confer and to submit a proposed judgment consistent with this opinion by April 15, 1998. If there is disagreement between the parties, a joint mailing should be made by the parties setting forth their differences by April 15, 1998.

**SO ORDERED.**