**E & H PARTNERS, Plaintiff,**

v.

**BROADWAY NATIONAL BANK, Defendant.**

**No. 96 Civ. 7098(RLC).**

United States District Court, S.D. New York.

Oct. 19, 1998.

Kalnick Klee & Green, P.C., New York City, for plaintiff, Allen Green, of counsel.

Law Offices of Jacques Catafago, New York City, for defendant, Jacques Catafago, of counsel.

## OPINION

ROBERT L. CARTER, District Judge.

Plaintiff, E & H Partners ("E & H"), brings this diversity action alleging that defendant Broadway National Bank ("Broadway National") wrongfully dishonored sight drafts on a standby letter of credit. Defendant moved for summary judgment pursuant to Rule 56, F.R. Civ. P., and plaintiff cross-moved. The central issue is whether plaintiff has complied with the terms and conditions contained in the letter of credit.

## FACTS

On February 25, 1995, upon application by Astro International Corporation ("Astro"), Broadway National, which is based in New York, issued an irrevocable standby letter of credit in the amount of $500,-000 in favor of E & H. E & H, a Delaware general partnership with its principal place of business in Florida, is a distributor of various consumer electronic products. Astro is a wholesaler of electronic goods, and applied for the Letter of credit in order to provide one of its domestic suppliers, Borlas Sales Corporation ("Borlas"), with collateral to purchase goods at a discounted price from E & H. In return for securing the letter of credit, Borlas agreed to sell to Astro, also at a discounted price, the goods it received from E & H. In addition, Borlas agreed to pay Astro a fee equal to 15% of the letter of credit a year, payable by monthly installments.[1]

---

1. Borlas has yet to pay the fee owed to Astro under the agreement, and has since filed for bankruptcy.

The letter of credit was made subject to the "Uniform Customs and Practice for Documentary Credits" (1993 Revision), International Chamber of Commerce (Publication # 500) ("UCP"). Payment not to exceed $500,000 would be made available to E & H by (typographical errors reproduced as in the original): "draft(s) drawn at sight on [Broadway National] and accompanied by the following documents:

1. Copy(ies) of commercial invoices(s).

2. Copy(ies) of signed bill of lading(s).

3. Copy(ies) of packing list(s).

4. Copy(ies) of signed Borlas Sales Corp. of NJ Purchase Order.

5. Copy(ies) of Notification to Astro International Corp., by E & H that Borlas Sales Corp., of N.J. is past due 30days on any invoice(s) to be drawn.

6. A statement properly signed by an authorized officer of E & H stating that the commercial invoice(s) referenced above was(were) presented to Borlas Sales Corp. of N.J. and was(were) not paid and remain unpaid at the time of the drawing."

The following "Special Condition[s]" also had to be met before the letter of credit could be drawn upon:

"1) Notification by E & H to Astro International Corp., that Borlas Sales Corp., of N.J. is past due 30 days on any invoice(s) to be drawn must be given 30 days prior to drawing.

2) All charges other than the issuing bank's are for the account of the beneficiary.

3) Drawings prior to 60 days after the payment due date on the commercial invoice(s) are prohibited.

4) Partial drawings are permitted.

5) All payments can not exceed the value of the L/C nor 100% of the commercial invoice(s) amounts.

6) Drawing must be presented with original stand-by letter of credit."

E & H informed Broadway National on or about February 8, 1996 that it intended to file a draft for the entire amount of the letter of credit, which was set to expire on February 24, 1996. On that same day, Theodore Morgan ("Morgan"), an officer of Broadway National, informed the president of Astro, Isreal Isreal ("Isreal"), that E & H was prepared to collect on the letter of credit. Isreal responded that he had never received the 30 day notification as required by the letter of credit and directed Morgan to refuse payment. Over the next few days, before Broadway National had received E & H's draft, Isreal called Morgan at least twice, again instructing Broadway National not to honor the credit.

On February 12, 1996, Broadway National received E & H's first sight draft, accompanied by numerous documents, demanding full payment on the letter of credit. The documents included unpaid invoices on various consumer electronics sent to Borlas totaling $626,000.30.

Several officers of Broadway National reviewed the letter of credit submission during the next few days. In the meantime, Isreal hired Arthur Grossman Esq. ("Grossman"), who also represented Borlas. Additionally, Isreal requested and received from Broadway National copies of E & H's submission, unbeknownst to E & H at the time. After reviewing the documents obtained from Morgan, Grossman wrote a letter dated February 14, 1996 informing Broadway National that Astro and Borlas believed that the documents did not comply with the letter of credit. The letter reiterated Astro's contention that it had never received the required 30 day notice. In addition, the letter listed six other conditions of the letter of credit that allegedly had not been met and cited among other things, missing bills of lading, packing lists, and nonconforming purchase orders as fatal discrepancies.

After several communications with Broadway National during the days following the February 12 submission, E & H

evidently believed that Broadway National was not going to honor its draft. On February 16, 1996, E & H filed a federal action in the Middle District of Florida against Broadway National, which was subsequently dismissed on jurisdictional grounds,[2] alleging breach of contract for the failure to honor its draft on the letter of credit. Around this time, E & H retained the services of Alexander Halberstein ("Halberstein"), an international trade consultant, to assist it in obtaining payment on the credit.

In a letter dated February 20, 1996, Broadway National notified E & H that it refused payment on the letter of credit, pending Astro's waiver of asserted discrepancies (which has never been granted). The letter listed multiple discrepancies, many of which mirrored the discrepancies contained in the February 14 letter by Astro's attorney, for each of the 13 submitted unpaid invoices. Chief among the stated discrepancies was the lack of 30 day notice to Astro and the fact that eight invoice numbers had been obviously altered by hand.

On February 23, 1996, Broadway National received E & H's second attempted draft on the letter of credit which was prepared with the assistance of Halberstein. Once again, Broadway National refused payment. In a letter dated February 28, 1996, Broadway National continued to assert problems with each of the 13 invoices, highlighting the lack of 30 day notice to Astro. For three of the invoices, this omission was the only cited discrepancy. For the other invoices, Broadway National did not assert that documents other than the notice letter were missing as it had in its first refusal to pay, only that they contained noncorresponding identification numbers and merchandise descriptions. Additionally, Broadway National noted as a discrepancy problems with the cover letter accompanying E & H's second

draft, including the fact that the number designating the letter of credit was incorrect. E & H did not have another opportunity to correct the alleged discrepancies, as the letter of credit had already expired on February 24.

Both parties agree that E & H's first submission of documents did not conform to the terms and conditions of the letter of credit. Thus, the primary question before the court is whether Broadway National wrongfully dishonored E & H's second sight draft. E & H asserts that the second set of documents fully complied with the requirements of the letter of credit, and furthermore that Broadway National ought to be estopped from asserting noncompliance of documents due to the bank's unreasonable delay in processing both of E & H's submissions. Broadway National denies both allegations, and argues additionally that E & H engaged in fraud by altering documents to conform to the letter of credit, and by attempting to collect on the credit in the first place. According to Broadway National, documents produced during discovery demonstrate that Borlas does not owe money to E & H, and thus Broadway National rightfully denied E & H's fraudulent attempt to collect on the standby letter of credit. The court now addresses each issue in turn.

## DISCUSSION

### I. Summary Judgment Standard

Defendant moves and plaintiff cross-moves for summary judgment pursuant to Rule 56, F.R. Civ. P. Under Rule 56(c), F.R. Civ. P., summary judgment is rendered when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." "[T]he substantive law will identify which

---

**2.** *See E & H v. Broadway Nat'l Bank,* No. 96–0398 (M.D.Fla. August 16, 1996) (final order of dismissal).

facts are material ... [and][o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Although summary judgment is never lightly granted, letter of credit disputes generally present legal issues, rather than questions of fact, and are thus often appropriate for final adjudication upon submission of papers and affidavits. *See Oei v. Citibank, N.A.*, 957 F.Supp. 492, 502 (S.D.N.Y.1997) (Mukasey, J.); *Bank of Cochin Ltd. v. Manufacturers Hanover Trust Co.*, 612 F.Supp. 1533, 1537 (S.D.N.Y.1985) (Cannella, J.); *Transamerica Delaval Inc. v. Citibank, N.A.*, 545 F.Supp. 200, 203 (S.D.N.Y.1982) (Werker, J.).

## II. Letters of Credit

A standby letter of credit acts to assure a seller that it will be promptly paid in the case of default by the buyer, and is payable upon certification of the buyer's nonperformance of the underlying contract. *See* John F. Dolan, *The Law of Letters of Credit, Commercial and Standby Credits* ¶ 1.04 (rev. ed.1996). The documents that accompany the beneficiary's draft tend to show that the applicant has not performed. *See id.* Lastly, the beneficiary must demonstrate by documents that it has performed the contract. *See id.*

■ A fundamental principle governing letters of credit and the characteristic which gives them their commercial utility and efficacy is that the obligation of the issuing bank to honor a draft on a credit is independent of the performance of the underlying contract. *See Alaska Textile Co. v. Chase Manhattan Bank, N.A.*, 982 F.2d 813, 815 (2d Cir.1992); *Voest–Alpine Int'l Corp. v. Chase Manhattan Bank, N.A.*, 707 F.2d 680, 682 (2d Cir.1983) ("[T]he great utility of letters of credit arises from the independent obligation of the issuing bank ....."). The duty of the issuing bank to pay upon the submission of documents which appear on their face to conform to the terms and conditions of the letter of credit is absolute, *see Beyene v. Irving Trust Co.*, 762 F.2d 4, 6 (2d Cir.1985), absent proof of intentional fraud on the part of the beneficiary. *See Voest–Alpine Int'l Corp.*, 707 F.2d at 686; *Semetex Corp. v. UBAF Arab American Bank*, 853 F.Supp. 759, 773 (S.D.N.Y.1994) (Sand, J.) (describing "narrow" fraud defense).

■ It is also a fundamental tenet of letter of credit law that the bank's absolute obligation to pay only arises when the beneficiary strictly adheres to the requirements of the letter of credit. *See Corporacion de Mercadeo Agricola v. Mellon Bank Int'l*, 608 F.2d 43, 47 (2d Cir.1979); *Beyene*, 762 F.2d at 6–7 (holding misspelling of name on bill of lading as material discrepancy); *Marino Indus. Corp. v. Chase Manhattan Bank, N.A.*, 686 F.2d 112, 118 (2d Cir.1982) (holding failure to submit proof that "legalized" packing list had been sent as sufficient grounds for dishonor). A corollary to the "strict compliance" rule is that the terms and conditions of the letter of credit must be explicit, *see Marino Indus. Corp.*, 686 F.2d at 115 ("Since the beneficiary must comply strictly with the requirements of the letter, it must know precisely and unequivocally what those requirements are."), and that all ambiguities are construed against the bank. *See Venizelos, S.A. v. Chase Manhattan Bank*, 425 F.2d 461, 466 (2d Cir.1970) ("[I]f ambiguity exists, the words are taken as strongly against the issuer as a reasonable reading will justify.").

■ Furthermore, even under the strict compliance rule, "some variations ... might be so insignificant as not to relieve the issuing or confirming bank of its obligation to pay." *Beyene*, 762 F.2d at 6. *See also Trifinery v. Banque Paribas*, 762 F.Supp. 1119, 1123 (S.D.N.Y.1991) (Sprizzo, J.); *Crist v. J. Henry Schroder Bank & Trust Co.*, 693 F.Supp. 1429, 1433 (S.D.N.Y.1988) (Knapp, J.); *Bank of Cochin Ltd.*, 612 F.Supp. at 1541. Such variations might include obvious typographical

errors, *see Beyene,* 762 F.2d at 6 (stating as example "Smith" misspelled as "Smithh"), or where the beneficiary submits five, instead of the required six, copies of identical documents, *Bank of Cochin Ltd.,* 612 F.Supp. at 1541.

▌Further principles of letter of credit law are embodied in the UCP, which applies to this letter of credit.[3] The UCP, a compilation of internationally accepted commercial practices, is not law. *See Western Int'l Forest Products, Inc. v. Shinhan Bank,* 860 F.Supp. 151, 153 (S.D.N.Y.1994) (Cedarbaum, J.); Dolan, *supra,* ¶ 4.06[1][c]. Yet, under New York law,[4] where a letter of credit is made expressly subject to the UCP, the UCP governs rather than Article 5 of New York's Uniform Commercial Code. *See* N.Y.U.C.C. § 5–102(4) (McKinney 1993). *See also Alaska Textile Co.,* 982 F.2d at 816 ("The UCP enjoys a unique status."). Courts, however, are free to consult the U.C.C. or pre-code case law in situations where the UCP is silent or ambiguous if it is not in conflict with the UCP. *See 3Com Corp. v. Banco de Brasil, S.A.,* 2 F.Supp.2d 452, 456 (S.D.N.Y.1998) (Sotomayor, J.); *M.J.F.M. Kools v. Citibank, N.A.,* 872 F.Supp. 67, 71 (S.D.N.Y.1995) (Mukasey, J.); *United Bank Ltd. v. Cambridge Sporting Goods Corp.,* 41 N.Y.2d 254, 260 n. 2, 392 N.Y.S.2d 265, 271 n. 2, 360 N.E.2d 943, 949 n. 2 (1976).

### III. Broadway National's Grounds for Dishonor

The appropriate starting point for any evaluation of an issuing bank's determination to dishonor a draft is its notice to dishonor. Article 14 of the UCP states that the notice of dishonor "must state all discrepancies in respect of which the bank

refuses the documents;" otherwise, the bank "shall be precluded from claiming that the documents are not in compliance with the terms and conditions of the Credit." UCP arts. 14(d)(ii) and 14(e).

### A. The 30 day notice requirement

The most serious ground for dishonor concerns Condition # 5 which requires E & H to provide 30 day notice to Astro that it intends to collect upon the letter of credit. Broadway National stated in both its February 20 and February 28 notices of dishonor, and continues to assert, that E & H did not comply with this condition because E & H's letter to Astro was addressed to the wrong zip code; more specifically, the zip code listed on the letter is "10001" where as Astro's correct zip code is "10010."

E & H does not deny that it mistakenly inverted the last two digits of Astro's zip code; rather, it argues that the notice arrived regardless of the mistake. As evidence, E & H submits an affidavit by a retired letter carrier for the United States Postal Service stating that there is "no doubt" that the letter would have been delivered to the correct address despite the erroneous zip code. The carrier, who was assigned to the Grand Central Post Office in Manhattan for virtually his entire 36 year career, also stated that the process of ascertaining the correct zip code would not result in a significant delay in the letter's delivery—most likely, a delay of one day.

In response to this evidence, Broadway National submits an affidavit by the managing director of "Astra International, Inc." located at 1140 Broadway, New York, New York, 10001. The director stated

---

3. The letter of credit explicitly incorporates the UCP.

4. Both parties appear to agree that New York law governs, as evidenced by their mutual reliance on New York law in their briefs. Where the parties have consented to the application of the law of the forum state, their

consent is sufficient to establish choice-of-law. *See American Fuel Corp. v. Utah Energy Dev. Co.,* 122 F.3d 130, 133 (2d Cir.1997) (parties' reliance on New York law in briefs sufficient to constitute consent); *3Com Corp. v. Banco de Brasil, S.A.,* 2 F.Supp.2d 452, 456 (S.D.N.Y.1998) (Sotomayor, J.) (same).

that he has received on "various occasions" mail and phone calls directed to Astro, which is located at 1133 Broadway, New York, New York 10010. The essence of Broadway National's argument appears to be that E & H's notification letter was received by Astra, which is not affiliated with Astro, since the letter was addressed to Astra's zip code. Thus, Broadway National contends Condition # 5 was not met because Astro never received the required notice. Broadway National also puts forth an affidavit from Astro's president stating that he never received E & H's notification letter.

On balance, the court finds E & H's evidence more persuasive. While it is possible to infer from the Astra International, Inc. affidavit that the letter was sent to the wrong address due to E & H's mistake, Broadway National has presented no evidence that the letter was in fact sent to the wrong address. In contrast, the court finds persuasive the statement by the post carrier that there is "no doubt" that the letter would have arrived at Astro in a timely manner despite the inverted zip code. While the court does not endorse E & H's additional argument that Condition # 5 should be read to require only that notice be sent, and not necessarily received, it is clear that if Broadway National desired a particular mode of delivery, or concrete proof that notice had been received by Astro, it was incumbent upon the bank to specify such requirements when it drafted the letter of credit. *See* UCP, art. 5(a) ("Instructions for . . . the Credit itself . . . must be complete and precise."); *Marino Indus. Corp.*, 686 F.2d at 116. While the UCP does state that "[i]n order to guard against confusion and misunderstanding, banks should discourage any attempt: (I.) to include excessive detail in the Credit," UCP, art. 5(a)(I), this clearly does not absolve issuing banks from stating the simplest instructions in clear, precise language.

■ Additionally, Broadway National argues that the notification letter is defi-

cient because it is not sufficiently detailed and fails to describe which invoices are past due. E & H's letter to Astro simply states: "Pursuant to the conditions of Letter of Credit No. 1537424 issued by Broadway National Bank we are putting you on notice that Borlas Sales Corp. is now past due 30 or more days on invoices totaling in excess of $500,000,000. Please be advised that E & H Partners intends to make a claim against the Letter of Credit for the full amount due." Broadway National contends that the contents of the letter do not satisfy the segment of Condition # 5 which states that notification shall be given "on any invoice(s) to be drawn."

However, this argument is not persuasive. Once again, the court directs Broadway National's attention to the UCP which states that the instructions to the letter of credit must be precise. *See* UCP, art. 5(a). *See also Marino Indus., Corp.,* 686 F.2d at 117 (requirements for payment must be specified "precisely and clearly"). Although it is possible to read Condition # 5 to require the listing of specific invoice numbers on the notification letter, E & H's interpretation of the condition is also quite reasonable. Keeping in mind that "if ambiguity exists, the words are taken as strongly as against the issuer as a reasonable reading will justify," *Venizelos, S.A.,* 425 F.2d at 466, the court finds that E & H's notification letter complied with Condition # 5 of the letter of credit. To be clear, the court is not endorsing the replacement of the strict compliance standard with a "reasonableness" one in ruling for E & H on this particular issue; rather, the court is simply reiterating that ambiguities in the instructions in a letter of credit will be resolved, if reasonableness allows, against the issuing bank.

## B. Noncorresponding Bills of Lading and Purchase Orders

Broadway National also asserts that it properly dishonored E & H's drafts on the letter of credit because the bank could not properly match invoice numbers and mer-

chandise descriptions among the submitted documents. For Invoices 1109–10 and 1109–14, Broadway National states as a discrepancy that: "Merchandise on commercial invoice are different from [bill of lading]." According to the bank officer that prepared the letter of dishonor, this referred to the fact that the bills of lading in question did not describe the merchandise listed on the associated invoices in sufficient detail. For example, Invoice 1109–10 demands payment for "remote color tv[s]." However, the bill of lading submitted along with that invoice failed to describe the merchandise in that manner; rather, it simply lists the item numbers of the goods being shipped. The problem with Invoice 1109–14 and its bill of lading is similar. Broadway National contends that these omissions on the bills of lading constitute fatal discrepancies under the UCP.

■ However, the UCP does not require, as Broadway National suggests, identical descriptions of the merchandise on the bill of lading and on the invoice. Under the UCP, "[d]ocuments which appear on their face to be inconsistent with one another will be considered as not appearing on their face to be in compliance with the terms and conditions of the Credit." UCP, art. 13(a). While the bills of lading and invoices in question may not contain the identical description of goods, it cannot be said that they are inconsistent with one another given that the item numbers and quantity numbers match. *See Beyene*, 762 F.2d at 6 ("[S]ome variations in a bill of lading might be so insignificant as not to relieve the ... bank of its obligation to pay").[5] Thus, with regard to this ground for dishonor, the court finds that E & H has complied with the UCP and the requirements of the letter of credit.

Broadway National also asserts as discrepancies the fact that item numbers on Invoices 1109–21, 1109–21B, 1109–22, 1109–23, 4840, and 5123 did not conform with item numbers on any purchase orders. The alleged flaw in all six invoices appears to be the same: the addition of the letters "AS" or "NG" to the item numbers on the invoice. For example, on Invoice 1109–21, the item number listed is "VCR3002–NG"; yet on the purchase order submitted with the invoice, the item number is listed as "VCR3002." Evidently, "NG" stands for "No Go" which means that the merchandise is electronically or cosmetically defective at the time of screening, and "AS" stands for "As Is" which means that the merchandise has not been checked.

■ In other respects, such as the price of the merchandise, the invoices and purchase orders in question match. The court fails to find that the addition of the letters "NG" or "AS" to the item numbers in the documents in question create an "inconsistency" under Article 13(a) of the UCP. The alleged flaws, thus, do not justify Broadway National's dishonor of E & H's draft.

## C. Errors on the cover letter accompanying the draft

■ Broadway National also states as discrepancies two errors on E & H's February 20 cover letter demanding payment. One error is the fact that E & H mistakenly referred to the letter of credit as "1547424" instead of "1537424," the correct designating number. Broadway National concedes that it knew which letter of credit the submission referred to, but argues nonetheless that the error violates the strict compliance rule. However, even under the strict compliance standard, a variance may be allowable "if there is no possibility that the documents could mis-

---

5. Furthermore, it is not a function of the bill of lading to serve as assurance that a particular type or quality of goods has been shipped. *See* John F. Dolan, *The Law of Letters of Credit, Commercial and Standby Credits* ¶ 1.07[1][c] (rev. ed. 1996) ("It is important

to distinguish the proper functions of the bill of lading ... from the notion that it serves as the carrier's guaranty that the seller has shipped conforming goods.... [C]arriers are not inspectors of goods shipped.").

lead the paying bank to its detriment." *Bank of Cochin Ltd.*, 612 F.Supp. at 1541 (citations omitted). As Broadway National admits that the erroneous number did not cause confusion, the court finds the error to be insignificant and thus not violative of the strict compliance rule. Furthermore, the "reason for the strict rule is to protect the issuer from having to know the commercial impact of a discrepancy in the documents." Dolan, *supra*, ¶ 6.04[3]. Requirements that help the bank identify the letter of credit, such as legends and designating cover letter numbers, are for the issuer's benefit; errors pertaining to these requirements do not call upon the reviewing bank officer to exercise discretion on a commercial matter, only to exercise discretion as a banker. The incorrect cover letter number simply required a determination of which letter of credit E & H wished to draw upon by Broadway National's bank officer, who had reviewed E & H's first draft less than two weeks earlier. As the erroneous number did not in fact cause confusion and did not compel an inquiry into the underlying commercial transaction, the mistake does not justify dishonor of E & H's draft.

For the foregoing reasons, the court holds that E & H's second submission conforms with the terms and conditions of the letter of credit.

## IV. Broadway National's consultation with Astro regarding the letter of credit

■ E & H argues that regardless of any alleged discrepancies, Broadway National should be estopped from asserting the nonconformity of the submitted documents due to the bank's improper consultation with Astro regarding the decision to honor the letter of credit. Under the UCP, "[i]n Credit operations all parties concerned deal in documents, and not with goods, services and/or other performances to which the documents may relate," and the bank "must determine on the basis of the documents alone whether or not they appear on their face to be in compliance with the terms and conditions of the Cred-

it." UCP, arts. 4 and 14(b). Thus, "[i]n determining whether to pay, the bank looks solely at the letter and the documentation the beneficiary presents, to determine whether the documentation meets the requirements in the letter." *Marino*, 686 F.2d at 115. These tenets assure that the bank's obligation under the letter of credit remain independent of the underlying commercial transaction.

The record shows a number of communications between Broadway National and Astro that appear to violate the principles of the UCP and the principle of good faith. Broadway National is correct in its assertion that, under the UCP, it is allowed to approach the payor (Astro) of the letter of credit for a waiver of any discrepancies with or without the beneficiary's (E & H's) approval. *See* UCP, art. 14(c). *See also Alaska Textile Co.*, 982 F.2d at 824; *Western Int'l Forest Products, Inc.*, 860 F.Supp. at 155 ("[I]t is a routine procedure for issuing banks to seek waivers from customers when a beneficiary presents non-conforming documents."). Letters of credit are "intended to grease the wheels of trade and commerce," *Alaska Textile Co.*, 982 F.2d at 824, and allowing the issuer to seek a waiver from the payor is efficient because generally the parties desire the execution of the letter of credit despite the discrepancies. *See id.*

■ However, it is clear in this case that the purpose of the multiple communications between Broadway National and Astro regarding the letter of credit was not to discuss waiver of the alleged discrepancies. In fact, the opposite seems to be true. It appears from the record that Astro played an active part in the bank's initial decision to dishonor E & H's draft. Not only did Astro repeatedly urge Broadway National to dishonor the draft, it also hired a lawyer to find errors in E & H's submissions. This type of communication between the issuing bank and the payor of the letter of credit cannot be allowed. First, such contact clearly violates the independence principle inherent in the UCP

and in letter of credit law. A bank has an independent obligation to the beneficiary; to permit the payor to pressure or collude with the bank to dishonor the draft destroys the very principle upon which the commercial utility of letters of credit rests. *See Voest–Alpine Int'l Corp.*, 707 F.2d at 682 ("Since the great utility of letters of credit arises from the independent obligation of the issuing bank, attempts to avoid payment premised on extrinsic considerations—contrary to the instruments' formal documentary nature—tend to compromise their chief virtue of predictable reliability as a payment mechanism."); *Semetex Corp.*, 853 F.Supp. at 770 ("This independence principle is universally viewed as essential to the proper functioning of letters of credit and to their particular value.").

Furthermore, under the law of New York, letters of credit, like other written contracts, imply good faith and fair dealing. *See Clark Oil Trading Co. v. J. Aron and Co.*, 172 Misc.2d 552, 561, 659 N.Y.S.2d 426, 432 (1997). In issuing the letter of credit, Broadway National made an implicit promise to independently review E & H's submissions. It is evident that the bank did not keep this promise. *See Bank of Cochin Ltd.*, 612 F.Supp. at 1539 ("An issuing bank's good faith discretion is most required when its customer seeks to avoid payment by objecting to inconsequential defects.")

For the foregoing reasons, the court concludes that Broadway National is estopped from claiming non-conformance with the terms and conditions of the letter of credit due to its improper consultations with Astro.

## V. Fraud

Fraud is a well-established exception to the rule that an issuing bank must pay when a beneficiary submits documents that conform on their face to the terms and conditions of the letter of credit. *See Rockwell Int'l Sys., Inc. v. Citibank, N.A.*, 719 F.2d 583, 588 (2d Cir.1983) (fraud defense "marks the limit of the generally accepted principle that a letter of credit is independent of whatever obligation it secures."). *See also Voest–Alpine Int'l Corp.*, 707 F.2d at 686; *3Com Corp.*, 2 F.Supp.2d at 460; *Semetex Corp.*, 853 F.Supp. at 773; *First Commercial Bank v. Gotham Originals, Inc.*, 64 N.Y.2d 287, 295, 486 N.Y.S.2d 715, 719, 475 N.E.2d 1255, 1259 (1985). Under the N.Y.U.C.C., an issuing bank may refuse to honor documents which comply on their face when a "required document . . . is forged or fraudulent or there is fraud in the transaction." N.Y.U.C.C. § 5–114(2). While the UCP does not explicitly provide for a fraud defense, New York law recognizes the availability of the defense under the UCP. *See Rockwell Int'l Sys., Inc.*, 719 F.2d at 588; *First Commercial Bank*, 64 N.Y.2d at 295 n. 4, 486 N.Y.S.2d at 719 n. 4, 475 N.E.2d at 1259 n. 4. The fraud defense, however, is a narrow one, and is available only where intentional fraud has been shown. *See Semetex Corp.*, 853 F.Supp. at 773.

Broadway National contends that E & H's submitted documents are "tainted with fraud." First, the bank claims that the required 30 day notification letter was back-dated; that is, E & H changed the date of the letter it submitted because it had failed to give timely notice to Astro. Broadway National bases this claim on a phone call that it received from E & H on or about February 8, 1996, in which a representative of E & H allegedly inquired about the proper method of delivering the notification letter under the terms of the letter of credit. According to the bank, this alleged inquiry by E & H demonstrates that E & H did not give timely notice, since the inquiry occurred on February 8 and the letter of credit was due to expire on February 24. Thus, claims Broadway National, E & H must have forged the letter dated January 18.

Before rendering summary judgment, a court must determine that any resolved issues are not material to the outcome of the litigation. *See Knight v. U.S. Fire Ins.*

*Co.*, 804 F.2d 9, 9 (2d Cir.1986). However, a party may not "rely on mere speculation or conjecture to overcome a motion for summary judgment." *Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985). Here, the court finds that Broadway National's allegations regarding the notification letter amount to exactly that— mere speculation and conjecture. Such allegations are not sufficient to defeat E & H's motion for summary judgment.

The second alleged instance of fraud concerns the unpaid invoices submitted by E & H for payment under the letter of credit. E & H's first submission included invoices that contained invoice numbers that were obviously altered by hand; for its second submission E & H, on the advice of an international trade consultant, "whited out" the hand-altered numbers and replaced them with type-written numbers. E & H claims that it changed the numbers to reflect the fact that they were partial shipments of one large order.

For submissions under letters of credit, "[f]alsified documents are the same as no documents at all." *Voest–Alpine Int'l Corp.*, 707 F.2d at 686. However, the party alleging fraud must present evidence that the misrepresentations are material to the requirements of the letter of credit. *See Semetex Corp.*, 853 F.Supp. at 775. In *Semetex Corp.*, for example, the beneficiary submitted an air waybill that contained information that conflicted with the actual flight date. *See id.* at 771. The bank in that case argued that the beneficiary had forged the shipping date on the air waybill, and that this forgery permitted the bank to dishonor the draft on the letter of credit. *See id.* The court held that even if the beneficiary had changed the date on the air waybill, the bank had failed to present evidence of fraud because the date of the shipment was immaterial to the requirements of the letter of credit. *See id.* at 775.

Similarly, in the present case, the invoice numbers are not material to the terms and conditions of the letter of credit. The letter of credit does not specify which invoices must be presented, only "Copy(ies) of commercial invoices." Additionally, there is no evidence that the invoice numbers were altered so as to not create inconsistencies with the other documents. Thus, whether E & H changed the invoice numbers is immaterial and cannot constitute fraud, as the numbers did not affect E & H's ability to draw upon the letter of credit.

Lastly, Broadway National claims that E & H's attempt to collect on the letter of credit is fraudulent in itself, since documents obtained during discovery allegedly demonstrate that Borlas does not in fact owe money to E & H. The bank puts forth as evidence E & H ledgers indicating that Borlas made occasional payments on its account, canceled checks from Borlas made out to E & H, and various E & H invoices for goods sent to Borlas stamped "Paid." Despite such documents, the court is entirely unpersuaded by such evidence. None of the documents put forth by Broadway National indicate that E & H has already collected on the invoices it submitted under the letter of credit. E & H does not claim that Borlas has never made any payments on its account, only that Borlas is in default with regard to the specific invoices presented for payment. Furthermore, it is clear that Borlas had an outstanding debt to E & H, well in excess of $500,000, before and after E & H's attempt to collect on the letter of credit. Astro's president testified that he was informed by Borlas that it owed approximately $1.4 million to E & H shortly after E & H submitted its first draft on the letter of credit. Communications between Borlas and E & H also show that on October 10, 1995, Borlas owed E & H $1,785,000; on March 15, 1996, $1,452,-637.00; on August 14, $851,161.21. On October 25, 1996, Borlas declared bankruptcy. While E & H may not have been wise in continuing its business relationship with Borlas in the face of such tremendous outstanding balances, bad business man-

agement is not a valid basis for dishonoring a draft on a letter of credit. It also certainly does not constitute sufficient evidence of fraud to defeat summary judgment.

## CONCLUSION

For the reasons discussed above, the court denies defendant's motion for summary judgment and grants plaintiff's cross-motion for summary judgment.[6]

**IT IS SO ORDERED.**

---

**6.** Since the court has granted summary judgment to E & H on other dispositive issues, the court declines to rule on the merits of its claim that Broadway National should be estopped from asserting noncompliance of submitted documents to the terms and conditions of the letter of credit due to the bank's unreasonable delays in processing E & H's drafts. However, the court notes that under Article 13(b) of the UCP, "the Issuing Bank, the Confirming Bank, if any, or a Nominated Bank acting on their behalf, shall each have a reasonable time, not to exceed seven banking days following the day of receipt of the documents, to examine the documents and determine whether to take up or refuse the documents and to inform the party from which it received the documents accordingly." UCP, art. 13(b). Furthermore, in this Circuit, what constitutes "a reasonable time" is to be determined by examining the behavior of those in the business of examining documents. *See Alaska Textile Co. v. Chase Manhattan Bank, N.A.,* 982 F.2d 813, 823 (2d Cir.1992).